**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELKIN VALLEY BAPTIST CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PNC BANK, N.A. and | ) | Civil Action No. 23-1798 |
| F.N.B. CORPORATION | ) | Judge Nora Barry Fischer |
| | ) | |
| Defendants. | ) | ECF Nos. 33 and 38 |
| | ) | |

**MEMORANDUM OPINION
ON DEFENDANTS' MOTIONS TO DISMISS**

## I.      INTRODUCTION

In this case, Plaintiff Elkin Valley Baptist Church ("EVBC" or "the Church"), a North Carolina non-profit corporation, brings claims against both F.N.B. Corporation ("FNB"),[1] the bank with which EVBC maintained its account, and PNC Bank, N.A. ("PNC"), the bank which accepted and processed  EVBC's wire transfer[2] of $793,876.10 intended for the Elkin Valley congregation's building contractor, Landmark Builders, Inc. ("Landmark"), of Winston-Salem, North Carolina. Defendant financial institutions are citizens of the States of Delaware (PNC) and Pennsylvania (FNB); maintain their principal places of business in Pittsburgh, Pennsylvania; and have branch offices in multiple states, including North Carolina.

---

[1] FNB asserts that it has been incorrectly identified as F.N.B. Corp., a bank holding company, rather than as that company's banking subsidiary First National Bank of Pennsylvania, which appears to be the bank with which EVBC transacted business.  (Docket No. 39 at 5).

[2] Such wire transfers are accomplished by what is referred to in the statutory and case law, and thus herein, as "payment orders" or "transfer orders".

As set forth in the Second Amended Complaint (the "SAC"), Plaintiff brings claims against each Defendant under 13 Pa. C.S. § 4A207, <u>Misdescription of Beneficiary</u> (part of Pennsylvania's codification of provisions of the Uniform Commercial Code ("UCC") governing wire transfers)[3] and for negligence under Pennsylvania common law.  Plaintiff grounds its claims in:

(a) Defendant PNC's (i) acceptance and payment - in violation of section 4A207(b)(2) - of the Church's wire transfer order when PNC "knew" that the *account holder name* belonging to the account number on the transfer order did not match the *intended beneficiary name* on that order, and (ii) negligent failures to exercise due care or diligence in opening and maintaining a fraudulent account, and/or in permitting withdrawal of Plaintiff's funds therefrom;[4] and

(b) Defendant FNB's negligent failures to (i) warn Plaintiff that PNC might pay the transfer order even if only the account number – and not the intended beneficiary name – on said order matched that of the PNC account, in violation of section 4A207(c)(2), and (ii) implement or adhere to reasonable systems of verification to ensure that its transfer orders reached the sender's intended beneficiary.

(Docket No. 28).[5]

---

[3] As related *infra* at Section V, Pennsylvania's codification of the UCC Funds Transfer provisions (UCC Article 4A) is set forth at 13 Pa. C.S. § 4A101 *et seq.* Section 4A207(b)(1) provides that if a bank receives a payment order that identifies the beneficiary by name and account number, the bank may rely on the account number even if the account holder's name identifies a different person than the beneficiary named in the order.  The bank may not, however, accept/process the order in reliance on the account number if the bank knows of the mismatch/"misidentification" as to the intended beneficiary's name. 13 Pa. C.S. § 4A207(b)(2).  The Court notes, for clarity, that references in the Code to the "beneficiary's bank" denote the bank which makes final payment in a wire transfer to the "beneficiary", usually as identified by the account number in a payment order.  The term does not, however, necessarily denote the bank of the beneficiary *named* in the order, or of the originator's intended beneficiary.

As also discussed, *infra,* for purposes of this statute, "know" means actual knowledge, and incorporates a bank's duty to reasonably disseminate information it has received to the individuals conducting its transactions. 13 Pa. C.S. § 1-202(b), (f).

[4] *Cf.* n.115, *infra*, (noting that the Court reads the SAC as asserting these common law negligence claims only for pre- and post-transfer conduct, rather than for the transfer itself).

[5] Plaintiff's SAC expresses an intention to add Individual and Business Entity Does (the individual(s) and entity perpetrating the fraud) as defendants when they are identified.  (Docket No. 28 at ¶¶ 4-5).  The Does are not named in the caption of the SAC, but they are labeled "Defendant" in the body.   Notwithstanding the requirement under Fed.

Pecuniary loss - suffered here by the congregation of a rural North Carolina church (and by extension others who may have also benefitted from or depended upon the Church's building project, *e.g.*, Landmark, its employees and suppliers, their families, and community businesses) - to fraud perpetrated through exploitations of personal and banking internet/electronic technology is increasingly common, and the financial and social costs of wire transfer fraud are increasing dramatically.[6]

Presently before the Court are Motions to Dismiss brought by Defendants PNC and FNB pursuant to Federal Rules of Civil Procedure 12(b)(6), together with Defendants' briefs in support, Plaintiff's briefs in opposition, Defendants' reply briefs, and Plaintiff's sur-reply.  (Docket Nos. 33-35, 37-40, 43 and 45).  The motions have been fully briefed and the parties have not requested

---

R. Civ. P. 10(a) that "[t]he title of the complaint must name all the parties", courts have held that "a party not properly named in the caption of a complaint may still be properly before the court if the allegations in the body of the complaint make it plain the party is intended as a defendant."  *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996), *quoted in CNX Gas Co. v. Lloyd's of London*, 410 F.Supp.3d 746, 752 (W.D. Pa. 2019).  Here, however, paragraphs 4 and 5 of the SAC make it clear that the EVBC does *not* intend that the Does constitute defendants, unless and until the SAC is amended to add them following ascertainment of their identities.  Accordingly, this Court need not now examine their effect on the Court's diversity jurisdiction under 28 U.S.C. § 1332.

[6] EVBC was apparently a victim of Business Email Compromise ("BEC"), an increasingly pervasive form of cybercrime that includes targeting businesses and individuals working with suppliers and inducing them to wire transfer funds to a fraudulent account.  *See, e.g.,* Salvatore Scanio, ABA, The Business Lawyer, Spring 2024 | Volume 79, Issue 2 (May 28, 2024), https://www.americanbar.org/groups/business_law/resources/business-lawyer/2024-spring/liability-of-the-beneficiary-bank-for-cybercrime-involving-fraudulent-funds-transfers/ (accessed June 20, 2024) (citing FBI Internet Crime Report 29 (2022), https://www.ic3.gov/Media/PDF/AnnualReport/2022_IC3Report.pdf ("2022 IC3 Report") (accessed Jul. 13, 2024); FBI, Business Email Compromise: The $50 Billion Scam (June 9, 2023), https://www.ic3.gov/Media/Y2023/PSA230609) (accessed Jul. 16, 2024).  *Cf.* Do Your Homework to Help Avoid Wire Transfer Scams | PNC Insights *https://www.pnc.com/insights/personal-finance/protect/do-your-homework-to-help-avoid-wire-transfer-scams.html* (accessed Jul. 15, 2024) (citing same and noting systems analysts' internal control/fraud protection procedures, such as recipient account verifications, for transfers from PNC accounts).

*See also* Dsu-Wei Yuen and Andy Lorentz, *Passing the Fraud Loss Hot Potato: Financial Institution Exposure in Business Email Compromise Cases,* Financial Services Enforcement and Litigation (February 16, 2023), https://www.dwt.com/blogs/financial-services-law-advisor/2023/02/business-email-compromise-bec-fraud-studco (accessed June 19, 2024) (noting that the industry "sector" that "arguably benefited most from the [pandemic-driven customer] shift to digital [payments] is a species of fraud known as [BEC]"); *id.* (noting the likelihood that given increasing consumer and business losses to fraud, regulators will wish financial institutions to assume more liability; the risks attendant on leaving systems-generated account alerts "unmonitored and uncleared"; and the institutional "obligations to implement a minimally effective program to detect suspicious activity under the Bank Secrecy Act").

oral argument.  After consideration of the parties' arguments and for the following reasons, this Court finds that the SAC states a claim for refund against FNB and for declaratory relief against PNC under Count I, for damages against PNC under Count II and for refund against FNB under Count III, but that the claim for damages against FNB under Count IV is preempted.  Accordingly, Defendant PNC's Motion will be denied (subject to limitations hereinafter set forth) and Defendant FNB's Motion will be denied as to Count III and granted as to Count IV.

The Court writes at some length at this juncture for two reasons:

1) Whether and when a UCC section 4A-207 action by a Business Email Compromise ("BEC") cybercrime target and wire transfer order "originator" (such as the Church) – against the "originator's bank" (such as FNB) which initially processed the order, or the "beneficiary's bank" (such as PNC) which ultimately transferred the originator's funds to the cybercriminal's account – is maintainable as a matter of law is itself a matter of substantially divergent analysis among the courts to have addressed it.[7]  This necessitated the Court's close examination of the law and reasoning as to each of the possible bases for dismissal.[8]

2) The interpretation of this statutory provision – including the scope of its preemption of common law[9] – is, and will continue to be, of swiftly increasing commercial and social import as

---

[7] *See generally, e.g.,* Gary D. Spivey, J.D., Annotation: *Construction and Application to Immediate Parties of Uniform Commercial Code Article 4A Governing Funds Transfers*, 62 A.L.R.6th 1 (Originally published in 2011).

[8] As discussed *infra,* the cases reflect differences in the courts' interpretation of important statutory provisions (*e.g.*, § 1-202 which addresses "knowledge") and in their application of the plausibility standard of Rule 12(b)(6) and principles of privity and agency.

As also noted, *infra,* the Court has found the parsing of the statutory provisions/law and factual applications undertaken by the District Court for the Eastern District of Virginia helpful in several respects.  *See Studco Bldg. Sys. US, LLC v. 1st Advantage Fed. Credit Union*, 2:20-CV-417, 2023 WL 1926747, at *12 (E.D. Va. Jan. 12, 2023) (Memorandum Opinion following bench trial); *see also generally, id.* (elucidating regulations, banking risk management systems and related account/transaction monitoring, rules-based software and institutional procedures as of 2018).  *Studco* is pending on appeal before the Fourth Circuit at Case No. 23-1148.

[9] *See e.g.*, Robert M. Lewis, *Allocation of Loss Due to Fraudulent Wholesale Wire Transfers: Is There a Negligence Action Against a Beneficiary's Bank After Article 4A of the Uniform Commercial Code?*, 90 Mich. L. Rev. 2565, 2574 (1992) ("*Allocation of Loss*"); 3 White, Summers & Hillman, Uniform Commercial Code § 22:9 *Preemption of Common Law Claims*, in Ch. 22, Article 4A: Funds Transfer Introduction and Scope (6th ed.) (November 2023

financial institutions continue to employ emergent digitized, automated and artificial intelligence ("AI") based business efficiencies, and cybercriminals seek further ways to exploit them. And the courts' analyses of statutory and common law causes of action in this context are inherently derived in part from, and have the potential to effect fundamental shifts in, paradigms of, *e.g.*, corporate agency and duties of care.

## II.    FACTUAL BACKGROUND

The following averments are taken from Plaintiff's succinct Second Amended Complaint. (Docket No. 28).  The Court assumes the factual components thereof are true for purposes of the present motion.  *See Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).  In relevant part:

In November 2022, the congregation of Elkin Valley Baptist Church was in the process of construction, pursuant to its agreement with Landmark Builders, Inc., a general contractor located in nearby Winston-Salem, North Carolina.[10]  At some time prior to November 7, 2022, an unknown defrauder led the Church to believe that Landmark was (a) encountering difficulties with its paper check processing and (b) directing that funds owed by the Church be wire transferred to Landmark's PNC Bank account.  (Docket No. 28 at ¶¶ 29-30).

At some time prior to November 7, 2022, PNC opened, on application by a yet unidentified individual, a business account ******8034 in an unidentified name and at an unidentified location (the "Account").  If the Account was opened in the name of Plaintiff's contractor, Landmark Builders, Inc., PNC's compliance with applicable federal and state regulations, its own policies/procedures and/or other "reasonable diligence" would have revealed discrepancies (such

---

Update).

[10] EVBC "was in the midst of a construction project for a new chapel", for which Landmark was its General Contractor. (Docket No. 22 at 4).

as registered address or Internal Revenue Service ("IRS") tax identification number), and the application/account was or would have been flagged as suspicious and discovered to be fraudulent at that time.  If the Account was opened in another name, that fictitious business entity was not a legal entity of record in any jurisdiction and/or the individual opening the account lacked authority, corporate records/documentation and/or personal identification, and/or provided fraudulent corporate records/documentation and/or personal identification.  Here again, the fraudulent nature of the application/account was or would have been discovered at that time through PNC's compliance with applicable law and its exercise of due diligence, including its customer identification and account verification processes. PNC's responsible Account Manager(s) either (a) failed to recognize material discrepancies/irregularities in the requisite business customer identification/documentation or (b) acted with knowledge and deliberate indifference in the interest of personal financial gain in the form of employment incentives.  (*Id.* at ¶¶ 8-18, 27-28).

Based on the information obtained during its requisite account verification process (*e.g.*, the nature of the business' activities, purpose of the account, and expected type/dollar value of its financial transactions), PNC's subsequent automated monitoring of the Account identified suspicious activity before and after "the fraud on Plaintiff was perfected through PNC's actions/inactions."  PNC was then required to file Suspicious Activity Reports with the federal Financial Crimes Enforcement Network ("FinCEN") and conduct further due diligence on the Account.  Although it was alerted to account fraud (by, *e.g.*, the IRS tax identification matching program, its own automated monitoring, and/or its further procedural inquiry in response to suspicious activity), PNC failed to act.  It did so in deference to "a practice of willful blindness and deliberate indifference", to avoid costs/responsibilities inherent in addressing fraudulent account issues and to "preserve transaction-related revenues [gained] from . . . suspicious

accounts." Despite knowledge it held or would have held with due care/diligence – that the Account was associated with neither Landmark Builders, Inc. nor any other legally established business, or was invalidly opened, *i.e.*, that it was fraudulent, PNC left the Account open. (*Id.* at ¶¶ 19-26).[11]

On November 7, 2022, pursuant to the mis-directions of the unidentified/unknown cybercriminal, EVBC initiated a wire transfer order in the amount of $793,876.10 through FNB, identifying the beneficiary's account by PNC number ******8034, and identifying the beneficiary's name and address – as required by FNB – as those of its contractor, Landmark. FNB did not notify EVBC that PNC might pay based on the account number even if it did not match the beneficiary's name.[12] EVBC had no obligations to the holder of the Account into which its

---

[11] *See also id.* at ¶¶ 41-49 (PNC also failed to comply with account opening/verification and suspicious activity procedures required of it, as a financial institution, under federal "Know Your Customer" ("KYC") regulations). The KYC regulations are part of the federal Anti-Money Laundering ("AML") laws. *Cf. Studco*, 2023 WL 1926747, at *4 ("The Bank Secrecy Act ('BSA') requires U.S. financial institutions to assist U.S. government agencies to detect and prevent money laundering, which includes reporting suspicious activity that might signify money laundering, tax evasion, or other criminal activities.").

Interdiction of fraud is one of the primary aims of the BSA/AML regulatory scheme. As the U.S. Treasury Department has observed,

> Fraud remains the largest and most significant proceed-generating crime for which funds are laundered in or through the United States. Criminals make billions of dollars annually by deceiving U.S. government programs, private companies, and individuals into sending funds via a variety of methods where those funds are ultimately unaccounted for, diverted, or stolen.

U.S. Treas. Dept., *National Money Laundering Risk Assessment (NMLRA)* (Feb. 2024), at 3; *id.* at 5. In particular, the government has come to emphasize the importance of banks verifying account holders' identities in order to combat fraud and resultant money laundering. *See* U.S. Treas. Dept., Financial Crimes Enforcement Network ("FinCEN"), Financial Trend Analysis, *Identity-Related Suspicious Activity: 2021 Threats and Trends* (Jan. 2024), at 1 (FinCEN "has highlighted the importance of customer identity in achieving its mission, and has included cybercrime and fraud as government-wide priorities"); *id.* at 4 ("At account opening, an identity process is necessary to . . . enable the financial institution to form a reasonable belief that it knows the true identity of each customer, based on the bank's assessment of the relevant risks and information provided . . . . Financial institutions may also rely on identity processes as part of authorizing account access by existing customers and when those customers are making transactions with counterparties."). *See also* Office of the Comptroller of the Currency, *Spring 2024 Semiannual Risk Perspective*, at 32 (FinCEN's findings "emphasize the critical importance of effective customer identification and verification processes, at account opening and throughout the banking relationship. . . . Effective processes to prevent, identify, and file [Suspicious Activity Reports] on fraudulent activity in a timely manner remain important to protect both banks and consumers . . . .").

[12] As set forth in Section III, FNB disputes this allegation – a topic addressed in Section VI(B)(3). *See infra*.

order was thus paid.  FNB failed to implement a reasonable verification system or otherwise verify that the beneficiary's name matched that of the Account holder.  (*Id.* at ¶¶ 31, 33-35, 82-87, 91-93).

PNC "took custody of" EVBC's funds on or about that day and deposited them to the Account.  PNC did so although it knew that neither the Account name nor its address matched those of the beneficiary designated on EVBC's wire transfer order, that is, despite "actual knowledge of a mismatch."  (*Id.* at ¶¶ 36-38, 41-43).[13]

PNC, having failed to follow applicable federal rules and regulations and/or its own internal procedures for suspending withdrawals from accounts identified as suspicious, then allowed all but $17,939.00 of the funds to be withdrawn from the Account by the BEC scammer(s).[14]  PNC later "remitted back to EVBC the $17,939.00" then remaining of its almost $800,000 sanctuary construction fund.  (*Id.* at ¶¶ 48-52).  PNC knew, or would have known in the exercise of reasonable diligence, that the Account ******8034, its holders and/or its transactions were suspicious and/or fraudulent at the time of (a) the Account's opening, (b) PNC's acceptance and deposit of the Church's transferred funds to the Account, and (c) withdrawal(s) of the funds from the Account thereafter permitted by PNC. (*Id.* at ¶¶ 52-56).  *See also* SAC paragraphs referenced *supra*.

---

[13] PNC's objection that the SAC "contains no factual allegations to indicate when, why, how, or through what circumstances PNC developed actual knowledge of the mismatch at the time of Plaintiff's wire transfer", *see* Docket No. 34 at 8, is addressed in Section VI(B)(1)(a), *infra*.  In brief, read in the light most favorable to the Plaintiff, the SAC alleges that (1) prior to accepting and processing the Church's wire transfer, PNC knew that the Account was suspicious (and subject to heightened monitoring under applicable federal regulations and PNC's own policies/procedures) or fraudulent and (2) PNC received and accepted Plaintiff's wire transfer order containing disparate name and account information.  (Docket No. 28 at ¶¶ 8-52).  And as discussed *infra*, under common law agency principles and UCC § 1-202(f)'s provision governing imputation of knowledge, it thereby plausibly alleges that PNC "knew" of the discrepancy between the intended beneficiary of the nearly seven-figure transfer order and the account holder of the suspicious/fraudulent Account.

[14] The Account withdrawal(s) were made in whole or in part by a yet unidentified cybercriminal at an unidentified branch location.  (Docket No. 28 at ¶ 53).

Despite knowledge of the mismatch between the Account name and that of the intended beneficiary of the wire transfer order, and despite awareness that such knowledge precluded PNC's acceptance of EVBC's transfer order under governing provisions of Article 4A, PNC nonetheless paid EVBC's funds to and through the fraudulent Account. The Church thereby lost $775,937.10. (*Id.* at ¶¶ 61-65).

The SAC seeks declaratory judgment and compensatory damages, together with punitive damages, interest, costs and attorneys' fees. (*Id.* at Request for Relief).

## III.   PROCEDURAL HISTORY

Plaintiff filed its initial, Amended and Second Amended Complaints on October 18, 2023, January 26, 2024, and April 26, 2024, respectively.  (Docket Nos. 1, 15 and 28).  Defendant PNC's Motion to Dismiss and Brief in Support were filed on May 10, 2024, with timely-filed Response in Opposition and Reply made by the parties thereafter.  (Docket Nos. 33-35 and 37).[15]  Defendant FNB's Motion to Dismiss and Brief in Support were filed on July 1, 2024, with timely-filed Response in Opposition and Reply made by the parties thereafter.  (Docket Nos. 38-40 and 43).

Plaintiff's Second Amended Complaint brings the following claims: Counts I and II – violations of 13 Pa C.S. § 4A207(b) and common law negligence, respectively, against Defendant PNC; and Counts III and IV – violations of 13 Pa C.S. § 4A207(c) and common law negligence, respectively, against FNB.

PNC asserts, in moving to dismiss Count I, that Plaintiff's claim under the UCC fails because EVBC (a) was not in privity with PNC, which processed the wire instruction in accordance with federal law and regulations and through an automated process that reviews only the account number provided, as is the industry custom, and (b) does not and cannot allege sufficient facts to

---

[15] *See also* Docket No. 34 at 7.

support a plausible claim under section 4A-207.  As to Count II, PNC asserts that EVBC's common law claim for negligence is preempted by the UCC and, to the extent it is not, the claim fails as a matter of law because the bank owes no duty to Plaintiff, a non-customer. (Docket No. 34 at 6).

FNB has submitted, as an Exhibit to its brief, a copy of a one-page Outgoing Wire Form ("OWF") that appears to bear the signature of Steve Owings on behalf of EVBC and lists the date, originator, transfer amount, beneficiary name and address, beneficiary's bank and account number (final four digits) all as set forth in the SAC.  (Docket No. 39-1 at 2).  FNB has also submitted, as part of the same Exhibit, three pages of Terms and Conditions ("T&C") which it asserts were incorporated in the OWF, including a "Governing Law" provision calling for application of Pennsylvania law, and an "Identifying Information" provision to the effect that FNB "may make payment . . . on the basis of an . . . account number despite the inconsistency of the name of the account holder and the Beneficiary."  (Docket No. 39-1 at 3-4).  In its opposing brief, Plaintiff does not dispute the authenticity of the one-page OWF, or the authenticity or authority of Mr. Owings's signature thereon; but Plaintiff does dispute the authenticity of the appended T&C.  In response, FNB has submitted, as an exhibit to its reply brief, the August 2, 2024 Affidavit of Vanessa Reiser which seeks to authenticate the T&C.  (Docket No. 43-2).

In moving to dismiss Count III, FNB argues that (a) despite not being attached to Plaintiff's SAC, the OWF (including appended T&C) may be considered by the Court because it is "integral to and explicitly relied upon in the SAC" and (b)  paragraph 7 of the T&C conclusively establishes that EVBC received notice that precludes its claim under section 4A-207.  (Docket No. 39 at 9-10, 14-15).  As to Count IV, FNB asserts that EVBC's common law claim for negligence is preempted by the UCC.  (*Id.* at 11-13).

As Defendants' motions have been fully briefed, they are ripe for disposition.

## IV.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain enough facts to state a claim to relief that is plausible on its face." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility exists somewhere between "possible" and "probable." The former necessitates factual allegations that are "more than merely consistent with a defendant's liability." *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But the latter only demands that the court be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citations omitted). Detailed allegations are not necessary to survive a Rule 12(b)(6) motion to dismiss; however, the complaint must contain "more than labels and conclusions" or "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citations omitted).

The United States Court of Appeals for the Third Circuit has instructed the district courts to utilize a three-step process in evaluating a Rule 12(b)(6) motion to dismiss. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022). First, the court must set out the elements of the plaintiff's claim; second, identify and disregard any "formulaic recitation of the elements" or allegations that are "so threadbare or speculative" as to amount to nothing more than mere conclusory statements; and, finally, evaluate "the plausibility of the remaining allegations" by assuming their veracity and "construing them in the light most favorable to the plaintiff[.]" *Id*. at 327-328 (alteration, internal quotation marks, and citations omitted). In addition, courts must draw all reasonable inferences in favor of the plaintiff. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-791 (3d Cir. 2016).

The ultimate plausibility determination, in turn, is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Connelly*, 809 F.3d at 786–

87, quoting *Iqbal*, 556 U.S. at 679.[16]  As the Third Circuit has repeatedly held, consideration of

the "context" for a plausibility determination necessarily includes analysis of the law governing

the claim at issue.  *See, e.g.*, *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 183–84 (3d Cir.

2024) ("When assessing the sufficiency of the complaint, we pay attention to the context of the

claim, including the underlying substantive law.") (brackets and internal quotation marks omitted).

## V.      RELEVANT STATUTORY PROVISIONS

### A.      Provisions of 13 Pa. C.S. § 4A207, Misdescription of Beneficiary

The rights, duties and liabilities of the parties with respect to a wire transfer order are

governed by Article 4A of the UCC.[17]

---

[16] *See also Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) ("Because the content of the duty . . . turns on 'the circumstances . . . prevailing' . . . , the appropriate inquiry [under *Iqbal* and *Twombly*] will necessarily be context specific.") (citations omitted).

[17] The Official Comment to UCC § 4A-102, which addresses the overall scope of the Article, provides in relevant part:

> Article 4A governs a specialized method of payment referred to in the Article as a funds transfer but also commonly referred to in the commercial community as a wholesale wire transfer. A funds transfer is made by means of one or more payment orders. The scope of Article 4A is determined by the definitions of "payment order" and "funds transfer" found in Section 4A-103 and Section 4A-104.

> The funds transfer governed by Article 4A is in large part a product of recent and developing technological changes. Before this Article was drafted there was no comprehensive body of law--statutory or judicial--that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. . . . . [A]ttempts to define rights and obligations in funds transfers by general principles . . . have not been satisfactory.

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

> Funds transfers involve competing interests--those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and

Section 4A-207, as codified in Pennsylvania, provides:[18]

(a) **Reference to nonexistent or unidentifiable person or account**. Subject to subsection (b), if, in a payment order received by the beneficiary's bank, the name, bank account number or other identification of the beneficiary refers to a nonexistent or unidentifiable person or account, no person has rights as a beneficiary of the order and acceptance of the order cannot occur.

(b) **Name and account number identify different persons**. If a payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons, the following rules apply:

(1) Except as otherwise provided in subsection (c), if the beneficiary's bank does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order. The beneficiary's bank need not determine whether the name and number refer to the same person.

(2) If the beneficiary's bank pays the person identified by name or knows that the name and number identify different persons, no person has rights as beneficiary except the person paid by the beneficiary's bank if that person was entitled to receive payment from the originator of the funds transfer. If no person has rights as beneficiary, acceptance of the order cannot occur.

(c) **Applicable rules when bank pays person identified by number**.  If a payment order described in subsection (b) is accepted, the originator's payment order described the beneficiary inconsistently by name and number and the beneficiary's bank pays the person identified by number as permitted by subsection (b)(1), the following rules apply:

(1) If the originator is a bank, the originator is obliged to pay its order.

(2) If the originator is not a bank and proves that the person identified by number was not entitled to receive payment from the originator, the originator is not obliged to pay its order unless the originator's bank proves that the originator, before acceptance of the originator's order, had notice that payment of a payment order issued by the originator might be made by the beneficiary's bank on the basis of an identifying or bank account number even if it identifies a person different from the named beneficiary. Proof of notice may be made by

---

liabilities inconsistent with those stated in this Article.

UCC § 4A-102 cmt.

[18] The Court notes that in a revision to the UCC very recently adopted by the Pennsylvania legislature, one word in § 4A-207 was changed (from "writing" to "record").  Because the revision post-dates the events at issue, the Court has set forth and applied the pre-revision Code.

any admissible evidence. The originator's bank satisfies the burden of proof if it proves that the originator, before the payment order was accepted, signed a writing stating the information to which the notice relates.

(d) **When person identified by number not entitled to receive payment**.  In a case governed by subsection (b)(1), if the beneficiary's bank rightfully pays the person identified by number and that person was not entitled to receive payment from the originator, the amount paid may be recovered from that person to the extent allowed by the law governing mistake and restitution as follows:

(1) If the originator is obliged to pay its payment order as stated in subsection (c), the originator has the right to recover.

(2) If the originator is not a bank and is not obliged to pay its payment order, the originator's bank has the right to recover.

13 Pa. C.S. § 4A207.

Comment 2 to section 207 observes that:

Subsection (b) allows banks to utilize automated processing by allowing banks to act on the basis of the number without regard to the name *if the bank does not know* that the name and number refer to different persons. 'Know' is defined in Section 1-201(25) to mean actual knowledge, and Section 1-201(27) *states rules for determining when an organization has knowledge of information received by the organization*.[19]  The time of payment is the pertinent time at which knowledge or lack of knowledge must be determined.

 UCC § 4A-207 cmt. 2 (emphasis added).  The Comment also observed that "the clear trend is for

beneficiary's banks to process payment orders by automated means . . . ."[20]  *Id.*

---

[19] Former UCC §§ 1-201(25) and 1-201(27) were subsequently (and prior to the events at issue) codified at UCC §§ 1-202(b) and 1-202(f), respectively.  *See* Section V(B), *infra*.

[20] Comment 2 provides more fully:

Subsection (b) . . . deals with the problem of payment orders in which the description of the beneficiary does not allow identification of the beneficiary because the beneficiary is described by name and by an identifying number or an account number and the name and number refer to different persons. A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means using machines capable of reading orders on standard formats that identify the beneficiary by an identifying number or the number of a bank account. The processing of the order by the beneficiary's bank and the crediting of the beneficiary's account are done by use of the identifying or bank account number without human reading of the payment order itself. The process is comparable to that used in automated payment of checks. The standard format, however, may also allow the inclusion of the name of the beneficiary and other information which can be useful to the beneficiary's bank and the beneficiary but which plays no part in the process of payment. If the beneficiary's bank has both the account number and name of the beneficiary supplied

14

by the originator of the funds transfer, it is possible for the beneficiary's bank to determine whether the name and number refer to the same person, but if a duty to make that determination is imposed on the beneficiary's bank the benefits of automated payment are lost. Manual handling of payment orders is both expensive and subject to human error. If payment orders can be handled on an automated basis there are substantial economies of operation and the possibility of clerical error is reduced. Subsection (b) allows banks to utilize automated processing by allowing banks to act on the basis of the number without regard to the name if the bank does not know that the name and number refer to different persons. 'Know' is defined in Section 1-201(25) to mean actual knowledge, and Section 1-201(27) states rules for determining when an organization has knowledge of information received by the organization. The time of payment is the pertinent time at which knowledge or lack of knowledge must be determined.

Although the clear trend is for beneficiary's banks to process payment orders by automated means, Section 4A-207 is not limited to cases in which processing is done by automated means. A bank that processes by semi-automated means or even manually may rely on number as stated in Section 4A-207.

In cases covered by subsection (b) the erroneous identification would in virtually all cases be the identifying or bank account number. In the typical case the error is made by the originator of the funds transfer. The originator should know the name of the person who is to receive payment and can further identify that person by an address that would normally be known to the originator. It is not unlikely, however, that the originator may not be sure whether the identifying or account number refers to the person the originator intends to pay. Subsection (b)(1) deals with the typical case in which the beneficiary's bank pays on the basis of the account number and is not aware at the time of payment that the named beneficiary is not the holder of the account which was paid. In some cases the false number will be the result of error by the originator. In other cases fraud is involved.

UCC § 4A-207 cmt. 2.

The Court further observes that the Comment, promulgated in 1989, reflects the social benefit balancing (between large-scale transactional efficiencies and social utility maximizing allocation of risk of loss) made by the drafters.

At the time the UCC's Fund Transfer provisions were first enacted, large numbers of financial transactions could be automatically processed by banks "using machines capable of reading orders" formatted with a payee-identifying number. Additional information provided on the order, *e.g.*, beneficiary name, although potentially useful, was presumed to require manual handling – increasing costs and introducing clerical error. Thus, the Comment concludes, "the benefits of automated payment [would be] lost" if banks were required to manually review and confirm such additional information about the intended beneficiary whenever available.

The current capabilities (*e.g.*, accessibility and retrievability of data, data storage capacities, processing speeds and programmable functions) of modern digital computing systems and transactional and account monitoring software, are vastly beyond those of the late 20th century. And the state-of-the-machinery assumptions reflected in the Comment (*e.g.*, the infeasibility of automating additional verification/transaction safeguards such as transfer order beneficiary name "skimming" and matching) are thus plainly and increasingly superseded. Fortunately, the statutory framework created by the drafters of Article 4A accommodates the anticipated automation evolution of its subject by providing a knowledge standard which expressly incorporates reasonableness parameters - ones that look to a bank's due care in its dissemination of corporate information received in the relevant technological, regulatory and internal practices contexts. *See* 13 Pa. C.S. § 1202 (set forth *infra*).

Finally, as discussed more fully, *infra*, Article 4A's incorporation of a reasonable dissemination standard is consistent with the drafters' intent to create "precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability" that would allow financial institutions "to predict . . . [and] insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately". UCC § 4A-102 cmt. Indeed, the limited liability paradigm established under Article 4A serves their "thoroughly considered" balance of (a) financial institutions' need to fashion their own transactional policies/procedures around discernable risks and (b) the public's interest in transactional rules with lastingly equitable and effective allocations of risk of loss. *See* 13 Pa. C.S. §§ 1202, 4A207.

**B.      Provisions of 13 Pa. C.S. § 1202, Notice; Knowledge**

The "General Definitions and Principles of Interpretation" for provisions of the UCC are

set forth in Article 1, including section 1-202, which provides:

> (a) Subject to subsection (f), a person has "notice" of a fact if the person: (1) has actual knowledge of it; (2) has received a notice or notification of it; or (3) from all the facts and circumstances known to the person at the time in question, has reason to know that it exists.

> (b) "Knowledge" means actual knowledge. "Knows" has a corresponding meaning.

> (c) "Discover", "learn", or words of similar import refer to knowledge rather than to reason to know.

> (d) A person "notifies" or "gives" a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it.

> (e) Subject to subsection (f), a person "receives" a notice or notification when: (1) it comes to that person's attention; or (2) it is duly delivered in a form reasonable under the circumstances at the place of business through which the contract was made or at another location held out by that person as the place for receipt of such communications.

> (f) **Communication to Organizations.** Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information.[21]

---

Nor does the Court find any tension between the incorporation of § 1-202(f)'s reasonable dissemination test for corporate "knowledge" (and thus potential transactional liability for want of due diligence as to intra-corporate communications) and § 4A-207(b)'s recognition of a "safe harbor" of reliance on an account number, properly read. *See* discussion in Section VI(B)(1)(d) *infra*.

[21] UCC § 1-202 cmt. ("Subsection (f) makes clear that notice, knowledge, or a notification, although 'received,' for instance, by a clerk in Department A of an organization, is effective for a transaction conducted in Department B only from the time when it was or should have been communicated to the individual conducting that transaction.").

The Court notes that, in keeping with general principles of corporate agency, § 1-202(f) imputes/attributes to the

13 Pa. C.S. § 1202.

### C.  Provisions of 13 Pa. C.S. § 4A402, Obligation of Sender to Pay Receiving Bank

The payment obligations set forth under section 4A-402 extend to funds transfers under section 4A-207 (relating to misdescription of beneficiary) and include in pertinent part:

> (b) **Payment order issued to beneficiary's bank**.  With respect to a payment order issued to the beneficiary's bank, acceptance of the order by the bank obliges the sender to pay the bank the amount of the order, but payment is not due until the payment date of the order.

> (c) **Payment order issued to receiving bank other than beneficiary's bank**. This subsection is subject to subsection (e) and to section 4A303 (relating to erroneous execution of payment order). With respect to a payment order issued to a receiving bank other than the beneficiary's bank, acceptance of the order by the receiving bank obliges the sender to pay the bank the amount of the sender's order. Payment by the sender is not due until the execution date of the sender's order. The obligation of that sender to pay its payment order is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order instructing payment to the beneficiary of that sender's payment order.

> (d) **Refund.**  If the sender of a payment order pays the order and was not obliged to pay all or part of the amount paid, the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay. Except as provided in sections [inapplicable here], interest is payable on the refundable amount from the date of payment.

13 Pa. C.S. § 4A402.  The effect of the foregoing provisions is to bring about "an orderly unraveling of a funds transfer" that is not completed, by requiring each bank in the chain to refund payment to its immediate sender.  *Grain Traders v. Citibank, N.A.*, 160 F.3d 97, 101 (2d Cir. 1998).

---

corporation the aggregated information/knowledge (*i.e.*, any notice, knowledge or notification of a fact) received by its employees/agents.  But also, in a refinement of general principles of agency and duties of care, it limits the corporation's charged "knowledge" with respect to a *particular transaction* to implementation of reasonable routines and compliance for internal communication (across organizational divisions) of such of that aggregated information/knowledge as would be "significant" to that transaction (and thus should be communicated to the individual agent(s) conducting it).

By imposing accountability on the corporation for the responsible uptake of knowledge (including, *e.g.*, informational relevance, relatedness, or significance) not only *of* but *from* the discrete information available to it, the Code serves to restrain the corporation from evading liability through institutional compartmentalization or willful blindness.  *See* Section VI(B)(1)(c), *infra*.  *Cf.* 13 Pa. C.S. § 4A102; n.20, *supra*.

**D.      Provisions of 13 Pa. C.S. § 4A507, Choice of Law**

Section 4A-507 provides choice of law rules for rights and obligations between and among

certain parties to funds transfers, including the following:

> **(a) General rule.--**The following rules apply unless the affected parties otherwise
> agree or subsection (c) applies:[22]
>
>> (1) The rights and obligations between the sender of a payment order and the
>> receiving bank are governed by the law of the jurisdiction in which the receiving
>> bank is located.
>>
>> (2) The rights and obligations between the beneficiary's bank and the
>> beneficiary are governed by the law of the jurisdiction in which the beneficiary's
>> bank is located.
>>
>> (3) The issue of when payment is made pursuant to a funds transfer by the
>> originator to the beneficiary is governed by the law of the jurisdiction in which
>> the beneficiary's bank is located.
>
> **(b) By agreement.--**If the parties described in each paragraph of subsection (a)
> have made an agreement selecting the law of a particular jurisdiction to govern
> rights and obligations between each other, the law of that jurisdiction governs those
> rights and obligations, whether or not the payment order or the funds transfer bears
> a reasonable relation to that jurisdiction.

13 Pa.C.S.A. § 4A507.

## VI.   DISCUSSION

Defendant PNC moves to dismiss Plaintiff's claims under UCC section 4A-207(b) and

common law negligence.  Defendant FNB likewise moves to dismiss Plaintiff's claims under UCC

section 4A-207(c) and common law negligence.  Upon careful consideration, PNC's motion will

be denied, albeit with the recognition that the UCC claim is limited to declaratory relief and the

common law claim is limited to PNC's conduct that pre- or post-dated the wire transfer; and FNB's

---

[22] "Subsection (c)" refers to UCC § 4A-507(c), which provides for choice of law by a funds-transfer system rule,
where applicable.  There is no indication on the present state of the record that such a rule applies or would alter the
otherwise applicable choice of law.  *See* n.31, *infra*.

motion will be denied as to the UCC claims and granted as to the common law claim.  The Court's rationale follows.

## A.    Jurisdiction, Venue and Choice of Law

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  (Docket No. 28 at ¶¶ 1-3, 65, 80, 89, 95; Docket No. 37 at 7 n.5).  Venue is appropriate under 28 U.S.C. § 1391 because both defendants are residents of this District.  (Docket No. 28 at ¶¶ 2-3).

In a diversity action, district courts apply federal procedural law and state substantive law. *See Gasperini v. Ctr. for Humanities, Inc*., 518 U.S. 415, 427 (1996).  A federal court exercising diversity jurisdiction applies the choice of law rules in the state in which it sits.  *Klaxon v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941) (noting that forum state's choice of law rules is substantive).  *See generally Harris v. Kellogg, Brown & Root Servs., Inc.*, 151 F. Supp. 3d 600, 611 (W.D. Pa. 2015) (describing Pennsylvania's "hybrid" choice of law rules).

With respect to EVBC's claims against FNB, section 4A-507(a) of the UCC provides as a "general rule" applicable "unless the affected parties otherwise agree", that "the rights and obligations between the sender of a payment order [such as EVBC] and the receiving bank [such as FNB] are governed by the law of the jurisdiction in which the receiving bank is located."  UCC section 4A-507(a)(1).  It appears that FNB is "located" in Pennsylvania,[23] where the bank

---

[23] The Court concludes that § 507(a)'s choice of law rule points to the location of FNB's headquarters or main office in Pennsylvania rather than to its branch location in North Carolina.  *Compare* UCC § 4-102(b), which provides:

> The liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

The specification of a branch location in the second sentence indicates that an unqualified reference to where "the bank is located" means the bank's headquarters rather than any branch location.  Since the drafters of the UCC knew

maintains its "main office",[24] its address for service of legal documents,[25] and more than half of its approximately 350 branches,[26] and where its parent holding company maintains its headquarters.[27]

Section 4A-507(b) further provides that if the sender and receiving bank "have made an agreement selecting the law of a particular jurisdiction to govern rights and obligations between each other, the law of that jurisdiction governs those rights and obligations, whether or not the payment order or the funds transfer bears a reasonable relation to that jurisdiction."  UCC § 4A-507(b).  As discussed in Section III, *supra* and in Section VI(B)(3), *infra*, FNB has submitted an OWF with appended T&C that purport to elect Pennsylvania law.  If the applicability of FNB's form is established, it will be controlling over the § 507(a) general rule.  In either case, it appears that Pennsylvania law will govern EVBC's UCC claims against FNB.[28]

---

how to localize choice of law (for an essentially local activity such as check cashing), under the principle *expressio unius est exclusio alterius*, the absence of a corresponding provision in § 507(a) evinces an intention not to apply the law of the branch office with respect to wire transfers.  *See, e.g.*, *Commonwealth v. Moyer*, No. 1438 MDA 2023, 2024 WL 2684209, at *5 (Pa. Super. Ct. May 24, 2024); quoting *Schock v. City of Leb.*, 210 A.3d 945, 965 (Pa. 2019) (Wecht, J., concurring) ("[U]nder the principle *expressio unius est exclusio alterius*, if the General Assembly includes specific language in one section of a statute but excludes it from another section, that language should not be implied where excluded."); *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 650–51 (Pa. 2021), quoting *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009) ([W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent.").

[24] *See Bizzarro v. First Nat'l Bank*, 804 F. App'x 190, 191 (3d Cir. 2020) (finding that "FNB's main office is located in Greenville, Pennsylvania", which controls its citizenship for diversity purposes under 28 U.S.C. § 1348).

[25] *See* https://www.fnb-online.com/contact-us#media (accessed Aug. 17, 2024).

[26] *See* https://locations.fnb-online.com/index.html (accessed Aug. 17, 2024).

[27] *See* https://www.fnb-online.com/about-us/corporate-information/corporate-overview (accessed Aug. 17, 2024).

[28] There is no averment before the Court that any part of the wire transfer at issue was carried out by means of a funds-transfer system with a rule that selects the law of a jurisdiction other than Pennsylvania to govern rights and obligations of the originator, or that EVBC had notice that the funds-transfer system might be used in the funds transfer and of the choice of law by the system when EVBC issued its payment order – all of which would be required pursuant to UCC § 4A-507(c) in order for the funds-transfer system rule to be applicable.  Moreover, the Court notes that even if the requirements of § 507(c) were met, the law selected thereunder would yield to the law selected by agreement of the parties (if such is established), as provided in § 507(d).

With respect to Plaintiff's claims against PNC, the Court observes that UCC section 4A-507(a) does not specify the law governing rights and obligations between an originator (such as EVBC) and a beneficiary's bank (such as PNC).  Moreover, Plaintiff contends that the choice of governing law as to its negligence claims against PNC is not presently determinable because the location where the Account was opened, and other information which appears to be exclusively within PNC's knowledge, has not been provided to the Court.[29]  The Court concurs that where a court has not been provided with "information from which [it] can divine which states have a significant relationship to the issues", it "cannot grant a motion to dismiss" unless "it is clear that [the plaintiff's] allegations could not state a valid claim under the laws of *any* of the potentially interested states".  *Gen. Accident Ins. Co. v. Fid. Deposit Co*., 598 F. Supp. 1223, 1230 (E.D. Pa. 1984) (emphasis added); *quoted in* Docket No. 35 at 7-8.[30]

Even if a full comparison of all potentially applicable laws were feasible in the present posture of the case, the Court finds such an unwieldy undertaking to be unnecessary.[31]  Because (i) both EVBC and PNC have invoked Pennsylvania law;[32] (ii) PNC has its principal place of

---

[29] Such other information may include, *e.g.*, location(s) at which (a) funds were withdrawn or (b) PNC made decisions or took/failed to take actions to approve the Account's opening, investigate the Account holder's identity, or report or follow-up on suspicious circumstances relating to the Account.

[30] The principle in *Gen. Accident* flows directly from the movant's burden under Rule 12(b)(6).  *See Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021), quoting Charles Alan Wright & Arthur R. Miller, 5A *Federal Practice and Procedure* § 1357 (3d ed. 2019) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").  If a claim would be cognizable under any potentially applicable law, then the movant has not shown that no legally cognizable claim exists.

[31] PNC suggests that only the laws of North Carolina (where Plaintiff is a citizen), Delaware (where PNC is a citizen) and Pennsylvania (where PNC has its principal place of business) could apply; and that each of those jurisdictions (along with "decisions across the country") has held that banks owe no duty of care to a noncustomer. (Docket No. 37 at 3, 7 & n.5). The Court does not find the potential choice-of-law inquiry to be so clearly limited; the state(s) where an account was opened and administered, for example, would also appear to have a significant relationship to an assessment of whether a duty was owed or breached.  PNC holds itself out as having branch locations in 28 states plus the District of Columbia, and it would be surprising if each jurisdiction had precisely the same laws governing the imposition of duty.  *See* https://apps.pnc.com/locator/browse (accessed July 6, 2024).

[32] *See e.g.*, Docket No. 28 at 8, 10 (asserting claims for violation of 13 Pa. C.S. § 4A207); Docket No. 34, *passim*.

business and 261 branches in Pennsylvania;[33] and (iii) this Court, being situated in Pennsylvania, is most readily familiar with its laws, the Court will begin with Pennsylvania – plainly a "potentially interested state".[34]  As outlined in the remainder of Section VI, *infra*, the Court finds that under Pennsylvania law EVBC's allegations state plausible claims.  And this determination necessitates denial of PNC's motion under the standard articulated in *Gen. Accident.*  The Court notes, however, that the parties remain free to assert that a different state's law applies if warranted following development of an appropriate record.

**B.      Plaintiff States Claims Under Article 4A of the UCC (Counts I and III)**

Application of all relevant provisions of Article 4A, and other incorporated UCC provisions, to the SAC (construed in the light most favorable to Plaintiff) leads the Court to conclude that the Church has stated sufficiently definite and plausible claims to be permitted to proceed with discovery.

**1.      Plaintiff May Not Pursue a Refund Claim Directly Against PNC, But May Pursue a Claim for Declaratory Relief Against PNC and Refund Claims Against FNB**

Plaintiff's SAC asserts two mutually-exclusive causes of action under Article 4A of the UCC: Count I, denominated against PNC, for violation of section 207(b)(2) under which the beneficiary's bank bears the loss from a fraudulent transfer where it knew of misidentification at the time of transfer, and its acceptance was thus invalid; and Count III, denominated against FNB,

---

[33] *See* https://apps.pnc.com/locator/browse (accessed July 6, 2024).

[34] By looking first to Pennsylvania law, the Court is following the path of other reported cases within the Third Circuit that have provisionally applied forum law, as invoked by a plaintiff, at the pleadings stage, pending development of a sufficient factual record for a choice of law determination.  *See, e.g.*, *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) ("[T]he factual record here is not yet full enough to make a choice of law determination . . . . However, the Court must still determine whether Plaintiffs have succeeded in stating a claim . . . .  Since Plaintiffs have made their allegations under New Jersey law, the Court will apply New Jersey law for the purpose of examining Plaintiffs' claim under the Rule 12(b)(6) standard."); *Harper v. LG Elecs. USA, Inc.*, 595 F.Supp.2d 486, 491 (D.N.J. 2009) (deferring choice of law analysis "until the parties present a factual record full enough", and meanwhile denying MTD based on NJ law as invoked by plaintiffs).

for violation of section 207(c) under which the originator's bank bears the loss where the beneficiary's bank did not know of the misidentification, its acceptance was thus valid, it paid the wire by account number to a non-entitled payee, and the originator's bank had not notified the originator that the beneficiary's bank might so proceed.[35]

The SAC requests declarations that each Defendant is liable to it for $775,937.10 (the amount of the wire transfer, less the amount ultimately returned to EVBC) plus interest, and further requests an award of damages in the same amount (without specifying against which Defendant(s)).  (Docket No. 28 at 12-13).[36]  In so doing, the SAC omits any reference to UCC section 4A-402, which governs payment and refund obligations among parties to a funds transfer. Whether or not it is invoked in the pleadings, section 402 necessarily controls any right to repayment stemming from section 207.  As the Seventh Circuit recently explained,

> Section 207 does not expressly reference Section 402.  But . . . Section 207 also does not itself provide the consequences when acceptance cannot occur.  It must be read within the context of Article [4A]'s statutory framework, and, within that framework, Section 402 explains those consequences.  . . . .  Section 402(d) is the means by which parties receive their 'money back' for non-obliged payments already made.

*Approved Mortg. Corp. v. Truist Bank*, 106 F.4th 582, 590 (7th Cir. 2024).

Under section 402(d), "a sender is only entitled to a refund from its receiving bank". *Id.* at 589.  That is, section 402 "'imposes a privity requirement such that a sender seeking a refund for an uncompleted funds transfer may look only to the receiving bank to whom it issued a payment order and payment.'" *Id.* at 591, quoting *Grain Traders*, 160 F.3d at

---

[35] Plaintiff's briefing also invokes § 4A-207(a), contending that no person obtained rights as a beneficiary under the payment order received by PNC because the "name, bank account number or other identification of the beneficiary" in the order referred to a "nonexistent or unidentifiable person or account".  (Docket No. 35 at 8, quoting 13 Pa. C.S. § 4A207(a) (emphasis removed)).  However, the difficulty with the payment order was not that it referred to a "nonexistent or unidentifiable person or account" – it did not – but that the beneficiary name and the account number identified different persons, a situation governed by § 4A-207(b) (addressed in text below) rather than by § 4A-207(a).

[36] The SAC also requests "such other and further relief as the Court may deem just."  (Docket No. 28 at 13).

106.[37]  Hence, the Church is not entitled to a refund under the Code directly from PNC,

even if PNC had actual knowledge of the name misidentification at the time of transfer and

thus bears the loss under section 207(b).

The Court rejects, however, PNC's assertion that the privity requirement inherent

in section 402's "chain of payment" provisions extends to the entirety of Plaintiff's Article

4A claim against it.  (Docket No. 34 at 15).  In support of this contention, PNC relies

principally on *Zhejiang Matrix SCM Co. v. PNC Bank*, No. CV 23-0979, 2024 WL

1096534, *4 (E.D. Pa. Mar. 13, 2024).  Although no UCC claim was before the *Zhejiang*

Court, it considered the privity question in deciding whether to grant leave to amend the

complaint, and opined that "*any* Article 4A claim would necessarily fail because Plaintiff

lacks privity with Defendant."  *Zhejiang*, 2024 WL 1096534 at *4 (emphasis added).

*Zhejiang*, in turn, relied entirely upon *Grain Traders* – and three district court cases, each

of which also relied upon *Grain Traders*.  *See Zhejiang*, 2024 WL 1096534 at *4 (*quoted

in* Docket No. 34 at 15).[38]  But the only UCC claim at issue in *Grain Traders* was a refund

claim under section 4A-402 where a wire transfer was not completed due to suspension of

payments by the beneficiary's bank and an intermediary bank.  *See Grain Traders*, 160

F.3d at 99-100.  In short, then, *Grain Traders* and the section 207 refund cases relying

thereon merely interpreted the statutory repayment provisions of section 402 to entail a

privity requirement.  They had no occasion to consider – and the Court concludes they

should not be interpreted to hold – that lack of privity bars *any* Article 4A claim.

---

[37] *See also Approved Mortg.*, 106 F.4th at 591 ("[T]he drafters of Article 4A intended 'to effect an orderly unraveling of a funds transfer in the event that the transfer was not completed, . . . by incorporating a 'privity' requirement into the 'money back guarantee' provision [of section 402(d)] so that it applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole.'") (quoting *Grain Traders*, 160 F.3d at 101).

[38] One of the district court cases cited in *Zhejiang*, *Approved Mortg. Corp. v. Truist Bank*, 638 F. Supp. 3d 941 (S.D. Ind. 2022), was recently affirmed in relevant part by the Seventh Circuit in an opinion discussed in text, *supra*.

Nor does the Court find support of a comprehensive privity requirement for all claims sounding under Article 4A in the text or structure of the Code.  As the official commentary to Article 4A's choice of law provision explicitly acknowledges, some rights stated in Article 4A regard parties who are *not* in privity.[39]  For example, Article 4A explicitly authorizes injunctive relief against a beneficiary's bank in connection with a funds transfer.  *See* UCC § 4A-503 ("For proper cause and in compliance with applicable law, a court may restrain . . . the beneficiary's bank from releasing funds to the beneficiary.").  This provision neither specifies nor limits who may bring an action to obtain such relief.  It cannot be supposed that even as it authorizes relief, the Code would, by *sub silentio* imposition of a privity requirement, close the courthouse door to the originator, who is the party most likely to be in need of it.  PNC itself appears to acknowledge that the originator of a wire transfer may sue the beneficiary's bank to enjoin release of transferred funds, as it cites *Chemalloy* for the proposition that the plaintiff "could have sought a court order to mandate the bank to freeze the funds."  (Docket No. 37 at 9).  *See Chemalloy Co. v. Citibank, N.A*, 609 F. Supp. 3d 370, 379 (E.D. Pa. 2022). That position is incompatible with PNC's posited Article-wide privity bar.[40]

---

[39] *See* UCC § 4A-507 cmt. 4 ("Most rights stated in Article 4A regard parties who are in privity of contract such as originator and beneficiary, sender and receiving bank, and beneficiary's bank and beneficiary. . . . . But that is not always the case.").

[40] As the Pennsylvania Supreme Court has emphatically abrogated privity requirements for causes of action that are not predicated on a contract, the Court doubts that it would impose such a requirement where the legislature has not so provided (either expressly or by necessary implication).  *See Brown v. City of Oil City*, 294 A.3d 413, 428 (Pa. 2023) ("[O]ur Court repudiated this privity requirement following Judge Cardozo's watershed opinion in *MacPherson v. Buick Motor Company*, 217 N.Y. 382 (1916).").  *See also Prost v. Caldwell Store, Inc.*, 187 A.2d 273, 277 (Pa. 1963) (quoting *Krisovich v. John Booth, Inc.*, 121 A.2d 890, 892 (Pa. Super. 1956) (observing that "consistently down to the present day, the rule of *MacPherson* . . . has been engrafted on our law")); *id.* at 276 (The privity rule "was at one time the law of the land but it has disappeared with the horse and buggy and the rule that a husband is authorized to beat his wife with a stick no bigger than the thickness of his finger.").

This Court therefore holds that, insofar as the SAC seeks declaratory relief against PNC, such relief is not barred by a privity requirement.[41]  A declaratory judgment claim (especially where both banks in the payment chain are before the Court) will promote Article 4A's goal of "certainty and finality", while avoiding the "uncertainty as to rights and liabilities" and "risk of multiple or inconsistent liabilities" that may result from allowing a party seeking a refund to "skip over the bank with which it dealt directly, and go to the next bank in the chain".  *Approved Mortg.*, 106 F.4th at 591-92, quoting *Grain Traders*, 160 F.3d at 102.

Finally, the Court observes that the Church has a right to seek a refund from the bank it paid, FNB, whether under section 207(b) (Count I) or section 207(c) (Count III).  Under section 207(b)(2), a beneficiary bank's knowledge of a misdescription entails that acceptance of a transfer cannot occur.  Under § 402(c), if a funds transfer is not completed by acceptance by the beneficiary's bank, the obligation of a sender (including the originator – in this case, EVBC) to pay its payment order is excused.[42]  On the other hand, where section 207(c) applies, absent the requisite notice, the originator is also "not obliged to pay its order."  UCC § 4A-207(c)(2).  In either of these cases, because the originator is not obliged to pay, § 402(d) comes into play, requiring the originator's bank (here, FNB) to refund the originator's payment.[43]  Consequently,

---

[41] Although (for reasons discussed in text, *supra*) Plaintiff will not be entitled to a declaration that PNC is liable to it for the sum demanded (at least under the UCC), Plaintiff's demand (including its request for "other and further relief") supports a claim for a declaration that PNC had actual knowledge of a misdescription of the beneficiary at the time of the funds transfer, and that the payment order therefore could not be accepted pursuant to § 207(b)(2).  The SAC and briefs reflect an actual controversy between EVBC and PNC concerning these questions, the resolution of which might determine the Church's rights against Defendant FNB.  The Declaratory Judgment Act authorizes such relief "whether or not further relief is or could be sought".  28 U.S.C. § 2201.

[42] Section 402(c) provides in relevant part: "With respect to a payment order issued to a receiving bank other than the beneficiary's bank, acceptance of the order by the receiving bank obliges the sender to pay the bank the amount of the sender's order. . . . .  The obligation of that sender to pay its payment order is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order instructing payment to the beneficiary of that sender's payment order."  UCC § 4A-402(c).

[43] Section 402(d) provides in relevant part: "If the sender of a payment order pays the order and was not obliged to

despite the reference to "(Defendant, PNC)" in the heading to Count I of the SAC, the provisions

of § 402 make it clear that the SAC's factual allegations relating to PNC's actual knowledge under

§ 207(b)(2) support EVBC's entitlement to receive repayment from FNB, rather than directly from

PNC.[44]

### 2. The SAC Plausibly Supports Claims Pursuant to UCC Section 4A-207(b) Predicated on PNC's Alleged Actual Knowledge of the Mismatch Between the Account Name and the Beneficiary Name at the Time of the Transfer

UCC section 4A-207(b) governs the effect of a discrepancy in a payment order's

identification of its beneficiary both by (a) name and (b) the number of a bank account held by a

different person than the named beneficiary.  And section 4A-207(b) prescribes very different

results depending on whether the beneficiary's bank "knows" of the discrepancy at the time of the

---

pay all or part of the amount paid, the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay."  UCC § 4A-402(d).

[44] Notwithstanding the SAC's labelling of Count I as against PNC, and its failure to take the controlling remedial scheme of § 402 into account, under Rule 8's notice pleading standard, it is not necessary for the Court to require EVBC to amend its complaint yet again in order to clarify that it is seeking repayment from FNB pursuant to § 207(b)(2) as well as § 207(c).

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests"[.]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Thus, "[u]nder the federal rules, as long as [an] issue is pled, a party does not have to state the exact theory of relief in order to obtain a remedy." *Bechtel v. Robinson*, 886 F.2d 644, 649 (3d Cir. 1989); *Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 563 (W.D. Pa. 2019) (same).  *See also, e.g., Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"); *Newman v. Silver*, 713 F.2d 14, 16 n.1 (2d Cir. 1983) ("[P]articular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not.'"); *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir. 1978) ("[T]he district court has the duty under Rule 8(a) . . . to read a complaint liberally and to determine . . . whether the facts set forth state a claim for relief on a basis other than the statutory basis pleaded.").  *See also* Fed. R. Civ. P. 1 (rules of procedure "should be construed, administered, and employed . . . to secure the just, speedy, and inexpensive determination of every action").

Applying these pleading standards to the present case, it appears that EVBC has demanded repayment of its diverted funds from FNB, and has alleged alternative sets of facts, either of which is sufficient to warrant the requested relief under alternative subsections of § 207.  This is sufficient to show EVBC's entitlement to relief (if its allegations are proved) and to give FNB fair notice of the alternative claims and their grounds. See Fed. R. Civ. P. 8(d)(2) (permitting "alternative statements of a claim" and indicating that "the pleading is sufficient if any one of [the alternatives] is sufficient").  In sum, as discussed *infra*, the SAC states claims against FNB under both § 207(b)(2) and 207(c).

transfer.[45]  If it *does not know*, it may "rely on the number" alone, and "need not determine whether the name and number refer to the same person"; but if it *does know* of the discrepancy, then "no person has rights as beneficiary" (with an exception not applicable here), and "acceptance of the order cannot occur."  13 Pa. C.S. § 4A207(b)(1) and (2), respectively.  *See* Section V(A), *supra*.[46]  If section 207(b)(2) applies and there was no effective acceptance, then the originator's obligation to pay said order was excused under section 4A-402(c), and under the "chain of repayment" provisions of section 4A-402(d), FNB must refund the payment it received from EVBC (but may recover from PNC).  Consequently, both PNC and FNB's potential UCC section 207(b) liability depends entirely on whether PNC knew of the mismatch between the beneficiary name and the account name at the time of the transfer. *See also* text at nn.42 and 43, *supra*.

A bank's knowledge of a mismatch is determined by reference to UCC sections 1-202(b) and (f).  As Comment 2 to section 4A-207 points out, "'[k]now' is defined in Section [1-202(b)] to mean actual knowledge, and Section [1-202(f)] states rules for determining when an organization has knowledge of information received by the organization."[47]  UCC § 4A-207 cmt.

---

[45] In most circumstances, knowledge of a discrepancy between the persons identified by name and number would be conveyed by information showing a non-trivial mismatch between the name provided in the payment order (the "beneficiary name") and the name of the holder of the account at the beneficiary's bank with the number provided in the payment order (the "account name").  For ease of understanding, this Opinion will often refer to a bank's knowledge of the discrepancy contemplated in § 4A-207(b) in terms of its knowledge of such a mismatch.

[46] As noted in Comment 2, this "safe harbor" (*i.e.*, a statutory limitation to broader liability potentially arising under common law negligence) was created through a balancing test that weighed two substantial and competing social interests: On one hand, facilitating nascent and commercially promising automated processing of fund transfers and, on the other hand, reducing transactional losses through appropriate allocations of risk.  The two-tiered statutory provision scaffolded by these interests – § 4A-207 – is one that cabins a beneficiary's bank's liability for negligence in fund transfers to circumstances in which said bank "knows" – through elected or otherwise required processes/procedures (*e.g.*, through its data acquisition and/or account and transaction verification/monitoring) - the account number and beneficiary name of the payment order and its mismatch/misidentification vis-à-vis the recipient account. The statute imposes a duty to reasonably disseminate significant corporate information/knowledge otherwise acquired (*e.g.*, in the interest of fund transfer loss reductions) while forgoing imposition under Article 4A of an independent duty to *confirm* a name and number match (in the interest of neither impeding electronic efficiencies nor introducing potential human error).  *See* n.20, *supra*.

[47] The bracketed alterations to the Comment's statutory cites are explained in n.19, *supra*.

2.  Under section 1-202(f), information received by a bank is "effective" for a particular transaction (such as a wire transfer) when it is, or in accordance with "reasonable routines for communicating significant information" would have been, brought to the attention of the person conducting the transaction.  13 Pa. C.S. § 1202(f).  Applying the foregoing statutory rules in the context of the comparative information comprising knowledge of a name mismatch, this Court finds that determination of whether a bank knew of said mismatch at the time of a wire transfer requires consideration of four subsidiary questions: (a) whether the bank received information as to the account name and the beneficiary name prior to completion of the transfer; (b) whether such information is deemed "actual knowledge" of the bank under applicable law; (c) whether the bank is charged under applicable common law with receipt of knowledge of a mismatch whose components (the account name and the beneficiary name) are imputed to the bank from separate sources; and (d) whether reasonable communications would require knowledge of the mismatch (or of its components) to be brought to the attention of the person conducting the wire transfer. Each of these questions is addressed in turn, *infra*.

### a.  Plaintiff's Allegations Plausibly Entail that PNC Received Information as to the Account Name and the Beneficiary Name Before or During the Transfer

Here, the SAC alleges that the payment order received by PNC, as beneficiary bank, included a beneficiary name and account number which identified different persons as between the named beneficiary of the order and the PNC account holder of that number.  (Docket No. 28 at ¶¶ 8,-9, 33, 35, 39, 58-60).[48]  The SAC further alleges that PNC had knowledge of this discrepancy at the time of the wire transfer.  (Docket No. 28 at ¶¶ 41, 43, 61, 63-64).[49]

_____

[48] The Court observes that Plaintiff's allegation to the effect that the identified account was in a name other than that of the transfer order's named beneficiary is stated in the alternative, as permitted under Fed. R. Civ. P. 8(d)(2).

[49] In its Reply, PNC baldly states that "Plaintiff's SAC has not alleged actual knowledge of a misdescription of the beneficiary at the time of payment", and that "[t]he SAC does not allege that, at the time of payment, PNC had actual knowledge of a misdescription in the payment order."  (Docket No. 37 at 11, 12).  The Court must disagree.  For

PNC objects that EVBC's allegations of actual knowledge are "bald, conclusory, and unsupported"; that "threadbare allegations of actual knowledge, without a single fact in support of such a contention, cannot sustain this type of claim"; and that the SAC "contains no factual allegations to indicate when, why, how or through what circumstances PNC developed actual knowledge of the mismatch at the time of Plaintiff's wire transfer." (Docket No. 34 at 8, 18).[50]

Contrary to PNC's objections, however, the SAC alleges that prior to November 7, 2022, a fraudulent actor/cybercriminal opened an account at PNC in a name other than "Landmark Builders, Inc.", to which PNC assigned the account number ******8034; and it alleges that a PNC business account manager at PNC's local branch assisted in opening the Account. (Docket No. 28 at ¶¶ 8, 9, 17). These alleged facts plausibly entail that upon opening the Account, PNC (through its account manager) received knowledge that the assigned account number identified a person other than Landmark Builders. *See* Section II, *supra*.

The SAC further alleges that on or around November 7, 2022, "PNC received a payment order for the benefit of Landmark Builders, Inc. with account number ******8034." Docket No. 28 at ¶ 58; *see also id.* at ¶¶ 31-33, 35-36. This plausibly entails that upon receipt of the payment order, PNC (*e.g.,* through its "wire room" or regulatory compliance/heightened review

---

example, the SAC alleges that PNC "knew the account number did not match the beneficiary's name" and that PNC deposited the transferred funds "[d]espite actual knowledge of the mismatch". (Docket No. 28 at ¶¶ 41, 43). One cannot act "despite" knowledge unless one possesses the knowledge at the time of the act. PNC's reading of "actual knowledge" is discussed in text *infra*.

[50] EVBC responds by correctly noting that Fed. R. Civ. P. 9(b) expressly permits knowledge to be alleged generally; but "general" does not mean "conclusory". Rather, in *Iqbal*, the Supreme Court explained that, while Rule 9 "excuses a party from pleading [a condition of mind] under an elevated pleading standard" such as "the particularity requirement applicable to fraud or mistake", allegations as to conditions of mind remain subject to the plausibility standard enunciated in *Twombly*. *Iqbal*, 556 U.S. at 686-87. Thus, Rule 9 "do[es] not require courts to credit a complaint's conclusory statements without reference to its factual context." *Id.* at 686. *See also id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Here, Plaintiff makes factual allegations that sufficiently support its § 4A207(b) claim under the presently applicable standard.

department employees)[51] received knowledge that said order identified the beneficiary by the name Landmark Builders, Inc. and by the account number ******8034.  *See* Section II, *supra*. Consequently, the SAC alleges facts which plausibly support a conclusion that PNC received knowledge of the account name and the beneficiary name by the commencement of its involvement in the wire transfer.

### b. PNC Is Deemed to Have "Actual Knowledge" of the Account Name and the Beneficiary Name Under Applicable Common Law Agency Principles

Under Pennsylvania's common law agency principles,[52] an agent's – such as a transactional employee's - knowledge relating to employment is held to be knowledge of the principal.  *See, e.g.*, *W.C.A.B. v. Evening Bulletin*, 445 A.2d 1190, 1192 (Pa. 1982), quoted in *Charter Oak Ins. Co. v. Maglio Fresh Foods*, 629 F. App'x 239, 246 (3d Cir. 2015) ("It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal.") (collecting cases; citations omitted).[53] PNC is thus charged with the knowledge of each of its employees/agents.[54]

---

[51] *Cf.* United States Federal Reserve Board, *Bank Secrecy Act Manual* § 701.0, "Wire Transfer Systems" (Sept. 1997) at 2 ("In the larger banks with a significant volume of wire traffic, there may be a department dedicated to [the 'wire room'] function.) (available at https://www.federalreserve.gov/boarddocs/SupManual/bsa/bsa_p5.pdf) (accessed Jul. 15, 2024).

[52] Application of these principles is expressly called for in the Code.  *See* 13 Pa. C.S. § 1103 ("Unless displaced by the particular provisions of this title, the principles of law and equity, including . . . the law relative to . . . principal and agent . . . , supplement its provisions.").

[53] *See also, e.g.*, *Fid. Bank v. Pierson*, 437 Pa. 541, 543 (Pa. 1970) ("[I]t is well-settled law that knowledge of the agent is knowledge of the principal"); *Nat. Bank of Bedford v. Stever*, 32 A. 603 (Pa. 1895) ("That the knowledge of an authorized agent, acquired in the course of a given transaction within the scope of his authority, is the knowledge of his principal is too familiar a doctrine to require argument in its support.  In this case the knowledge of the plaintiff's cashier, if acquired in the course of the transaction . . . , would be the knowledge of the bank".); *Bank of Shamokin v. Wayn'boro K. Co.*, 172 A. 131, 134 (Pa. 1934) (cashier "acted for the bank, and his knowledge . . . is properly imputable to his principal, the bank").

[54] In addition to knowledge imputed from a corporation's officers and employees, a substantial line of authority holds that a corporation is charged with knowledge of information in its books and records.  *See, e.g.*, *Curtis v. Connly*, 257 U.S. 260, 262–63 (1921) ("The bank of course must be charged with knowledge of what appeared upon its books."); *Mid-Continent Anesthesiology, Chartered v. Bassell*, 504 P.3d 1069, 1081 (Kan. App. 2021) ("a corporation is charged

Although cases often describe the principal's knowledge as "imputed", the Pennsylvania Supreme Court has long held that in the case of a corporate principal (which by its nature cannot actually be aware of a fact), the imputed knowledge may properly be deemed actual knowledge. For example, in *Bank of Shamokin*, immediately after holding the cashier's knowledge "imputable" to the bank, the Court noted that:

> A line of authorities treat the question as one of direct knowledge rather than of imputed knowledge. These courts have reasoned . . . : 'that a corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution it can have no other knowledge than that of its officers, and, in dealing with such officers, as with the corporation itself, third parties have a right to consider what they know it knows. Indeed, when the presiding officer of a corporation is entrusted with the transaction of its business, with full power to bind the corporation in respect to such business, it seems more proper to call the knowledge which he has actual knowledge of the corporation rather than to say it is imputed.'

*Bank of Shamokin*, 172 A. at 134 n.2 (collecting cases; citation omitted).  *See Gordon v. Contl. Cas. Co.*, 181 A. 574, 577-78 (Pa. 1935) (quoting from the foregoing passage and referring to it as a "rule" established by the line of authorities cited in *Bank of Shamokin*).[55]  This Pennsylvania

---

with knowledge of its own records"); *Buffalo Laborers Welfare Fund v. Leone Constr., Inc*., No. 18-CV-00544-JJM, 2020 WL 6264451, at *2 (W.D.N.Y. Oct. 23, 2020), quoting *Washington Nat. Ins. Co. v. Reginato's Estate*, 272 F. Supp. 1016, 1021 (N.D. Cal. 1966), *aff'd*, 382 F.2d 1021 (9th Cir. 1967); *Bunge Corp. v. Mfrs. Hanover Tr. Co.*, 318 N.Y.S.2d 819, 836 (N.Y. Sup. Ct.), *modified*, 325 N.Y.S.2d 983 (N.Y. App. Div. 1971), *aff'd*, 286 N.E.2d 903 (N.Y. 1972). *Cf. Schrader v. Prudential Ins. Co. of Am*., 280 F.2d 355, 361 (5th Cir. 1960) (tempering application of general rule by declining to hold insurer to knowledge in group hospitalization records where transcription of records from group policy claims to underwriting department would be "impracticable and costly"). *But see Squeeze Me Once, LLC v. SunTrust Bank*, 630 F. Supp. 3d 763, 775 (M.D. La. 2022) (bank's "stored data regarding the misdescription does not constitute . . . actual knowledge . . . . . if such data is merely stored electronically and not reviewed manually"); *Langston & Langston, PLLC v. SunTrust Bank*, 480 F. Supp. 3d 737, 744 (S.D. Miss. 2020) ("Data stored in a computer system does not constitute actual knowledge, even if inspection of the data would have revealed a misdescription.").  In the present case, it appears that the account opening documents (containing the account name) and payment order documents (containing the beneficiary name) as described in the SAC are records of PNC.

[55] The *Gordon* court recounted a case holding that (a) the cashier who had been "the sole representative of the bank" in a transaction, "in fact, was the bank", and (b) the bank "must be taken to have known what he knew."  It held, moreover, that "[w]e are not required to resort to the legal fiction of a constructive notice, but have as specific and actual a notice as if it had been placed in writing and read to the board of directors in meetings regularly assembled." *Gordon*, 319 Pa. at 565-66.

Although *Gordon* and *Bank of Shamokin* were decided in the 1930s, their continuing vitality may be seen from their favorable (and in the case of *Gordon*, repeated) citation in a relatively recent unanimous opinion of the Pennsylvania Supreme Court (responding to a certified question from the United States Court of Appeals for the Third Circuit).  *See*

rule is in accord with "black letter" agency law.  *See* Restatement (Third) of Agency § 5.03 cmt. b (2006) ("If an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact.")*, cited in Pricewaterhousecoopers*, 989 A.2d 313, *passim.  See also, e.g.*, *Aberts v. Verna*, No. 1214 EDA 2016, 2017 WL 319026, at *10 (Pa. Super. Ct. Jan. 23, 2017) (citing Restatement section 5.03 as authority for agency principle quoted from *Evening Bulletin*, *supra*); *In re Rotavirus Vaccines Antitrust Litig.*, 30 F.4th 148, 155 (3d Cir. 2022) (relying on Restatement section 5.03 in discussing Pennsylvania agency law). Accordingly, the Court will deem the knowledge of PNC's agents with respect to the account opening and the payment order to be the actual knowledge of PNC.

### c. PNC Is Charged with Receipt of Knowledge of a Mismatch Between the Account Name and the Beneficiary Name Under the "Collective Knowledge" Principle

Under general principles of agency law, as articulated in the Restatement (Third) of Agency and in numerous reported cases, if PNC possessed both of the foregoing pieces of knowledge – the beneficiary name and the account name - simultaneously at the time of the funds transfer, then it knew that the payment order identified Landmark Builders, Inc. as beneficiary by name and some other person by number.  In other words, it knew of the mismatch.  *See* Restatement (Third) of Agency § 5.03 cmt. c (2006) ("Organizations are treated as possessing the collective knowledge of their employees and other agents, when that knowledge is material to the agents' duties, however the organization may have configured itself or its internal practices for transmission of information.").  *See also, e.g.*, *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000), *cited in* Restatement (Third) of Agency § 5.03 Reporter's note to cmt. c (2006) ("The knowledge necessary to adversely affect the corporation need not be possessed by

---

*Unsec. Cred. v. Pricewaterhousecoopers*, 989 A.2d 313, *passim* (Pa. 2010).

a single corporate agent; the cumulative knowledge of several agents can be imputed to the corporation."); *id.* (explaining that "[w]ithout such an interpretation, corporations could avoid the adverse implications of the rule by restricting the intra-corporate flow of information.") (citation and internal quotation marks omitted); *U.S. v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir. 1987) ("Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components.  The aggregate of those components constitutes the corporation's knowledge of a particular operation.").  In sum, under the Restatement and supportive case law, the cumulative/aggregate employment-related knowledge of its employees/agents is attributed to the corporation.  And the corporation is charged with both (a) all such discrete knowledge and (b) knowledge of the inter-relatedness/significance reasonably derivable therefrom.[56]

The case of *Green Tree Acceptance* illustrates application of the collective knowledge doctrine to comparative facts (*i.e.*, a recognition of significance derived from a comparison of discrete facts, such as recognition of a misidentification between the account holder name and the beneficiary name):  There, the court held that the corporate seller of a motor home had actual knowledge of a discrepancy between the odometer mileage statement signed by its salesman and the higher mileage listed on an earlier certificate of title in its possession, regardless of whether any employee "actually saw the mileage reading on the certificate of title", or "understood its significance" or "communicated the information" to the salesman.  *See Green Tree Acceptance, Inc. v. Holmes*, 803 S.W.2d 458, 460 (Tex. App. 1991), *cited in* Restatement (Third) of Agency § 5.03 Reporter's note to cmt. c (2006).  The court concluded that the corporation was bound by the

---

[56] Thus, § 1-202(f) is essentially an application and further refinement of these established principles of agency and corporate governance to the context of commercial transactions. *See* Section VI(B)(1)(d) & n.58, *infra*.

information in its title certificate and could "not now claim that the corporate structure itself denied its other employees actual knowledge of the contents of the instrument." *Id.*[57]

Just as knowledge of discrepancies/falsities recognizable by a comparison of discrete information known to individual employees or separately contained in the corporations' records was imputed to the corporate defendants in the above-cited cases, so too the collective knowledge doctrine would impute knowledge of the mismatch – which precluded its approval of the Church's transfer order – to PNC. In other words, if actual knowledge of the account name and the beneficiary name both are imputed to PNC, then under common law agency principles PNC is also charged with actual knowledge of the mismatch between them.[58]

As discussed in subsection VI(B)(1)(d) directly below, however, the Code creates a safe harbor for a beneficiary bank which might otherwise face broader common law negligence liability

---

[57] To similar effect, *see United States v. Sawyer Transp., Inc.,* 337 F. Supp. 29, 30–31 (D. Minn. 1971), *aff'd*, 463 F.2d 175 (8th Cir. 1972) (Motor carrier's drivers' citations for driving with overweight loads while daily logs claimed they were off duty demonstrated "actual knowledge of falsity in the possession of the defendant corporation to be gleaned from its own records . . . [which] cannot be excused merely by asserting that one employee knew of the logs and another of other facts but that neither knew what the other did. Both were corporate employees and knowledge of each is imputed to the corporation which thus had knowledge."). *See also Inland Freight Lines v. United States*, 191 F.2d 313, 315 (10th Cir. 1951), *quoted in Sawyer Transp.*, 337 F. Supp. at 31 ("The logs and the reports did not find their way into the hands of a single agent or representative of the company after they were filed. No single agent or representative . . . had actual knowledge of their conflicts and falsities. But one agent or representative had knowledge of the material contents of the logs and another had knowledge of the material contents of the reports. And the knowledge of both . . . was attributed to the company.").

[58] A persistent theme running through the Restatement and caselaw is that attributing collective (and its subset, comparative) knowledge to a corporation is justified by the corporation's control over its own organizational structure and information dissemination practices. *See* Restatement (Third) of Agency § 5.03 cmt. c (2006) (organization charged with collective knowledge of agents "however the organization may have configured itself or its internal practices for transmission of information."); *Gutter*, 124 F. Supp. 2d at 1309 (without such a rule corporations could avoid imputation of knowledge "by restricting the intra-corporate flow of information"); *Bank of New England*, 821 F.2d at 856 (aggregation necessary because "[c]orporations compartmentalize knowledge"); *Green Tree Acceptance*, 803 S.W.2d at 460 (rejecting claim that "corporate structure itself denied . . . other employees actual knowledge").

This justification – and the concern it reflects regarding incentives for appropriate dissemination of corporate information – has informed the analysis and application of the collective knowledge principle. More particularly, as highlighted in the parentheticals above, the Restatement and supporting cases suggest that charging a corporation with comparative knowledge (absent such knowledge having first been obtained by an employee/agent), is implicitly based on the "reasonable due care" standard applicable to and critically guiding the business conduct of commercial enterprises. It is apparent that this common law standard presages the due diligence standard of § 1-202(f), which bases the "effectiveness" of such information for commercial transactions on the reasonableness of the organization's communication routines.

for a transactional loss on the basis of collective knowledge attributed to it.  As provided in section 1-202(f), the statute confines such knowledge-based liability to the corporation's lack of due diligence – that is, to its failure to adopt routines for the communication of discrete information to the employees or agents responsible for conducting transactions for which that information has foreseeable potential relevance[59] (i.e., it simply requires the reasonable dissemination of "significant" corporate information).

> ### d. Plaintiff's Allegations Plausibly Entail that PNC's Knowledge of the Mismatch Was Effective for the Transfer Because It Would Have Been Brought to the Attention of the Individual Conducting the Transaction Under a Reasonable Routine for the Communication of Significant Information

PNC's institutional actual knowledge of a mismatch between beneficiary name and account name is a necessary but not sufficient condition for finding PNC's acceptance of the payment order ineffective.  Under the UCC, when an organization has "received" knowledge, that knowledge does not become "effective for a particular transaction" until it is "brought to the attention of the individual conducting that transaction" (or would have been, if PNC had exercised due diligence).[60]  13 Pa. C.S. § 1202(f).  *See also* Section V(B) & n.21, *supra*.  Thus, determination of

---

[59] Considerations that may make information relevant to a corporate transaction include its potential effect not only on the corporation's own interests, but also on broader societal interests.  *Cf., e.g.*, *Clewell v. Pummer*, 121 A.2d 459, 463 (Pa. 1956) (predicating negligence on whether risk to others "outweighs the advantage accruing to the actor").  *Cf. e.g.*, nn.18 and 25, *supra*.

[60] The language and structure of § 1-202(f) evidence an intent to accord information that would have been brought to the attention of the person conducting a transaction (pursuant to reasonable routines for communication of significant information) the same effect as information that actually *was* brought to that person's attention.  *Cf., e.g.*, *Jones Ests. LLC v. Burgagni*, No. 2:22-CV-00646, 2023 WL 6392516, at *3 (W.D. Pa. Oct. 2, 2023) ("Equity regards as done what ought to have been done.").  Here, upon transmission of the payment order to it, PNC plainly received notice of the intended beneficiary's name.  *See* UCC § 1-202(a), (e) (defining notice, and receipt thereof).  If this information had been brought to the attention of the individual conducting the wire transfer, that person would have had actual knowledge of the beneficiary's name, because "attention" is equivalent to "awareness".  *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184-87 (2020) (holding that an individual has "actual knowledge" of a fact when he is aware of it); *Harris v. Com., Sec'y of Educ.*, 372 A.2d 953, 955 (Pa. Cmwlth. 1977) (where rule is periodically "brought to the attention" of teachers, "there can be no doubt" that a particular teacher was "aware" of it).  Consequently, if maintenance and compliance with reasonable routines for communication of significant information would have brought the beneficiary's name to the attention of the individual conducting the wire transfer, then § 1-202(f) dictates that the same actual knowledge of that information be imputed to PNC as if the information had been brought to that person's attention.  This result, converting "information" (such as notice) into "knowledge" through

whether PNC had "effective" actual knowledge of a name mismatch requires consideration of what information PNC received before and during the funds transfer, and whether such information should have been communicated to the person conducting the transaction.[61]

The text of section 1-202(f) plainly contemplates that every transaction of an organization will be "conducted" by an individual within the organization.[62]  The SAC does not indicate the

---

application of (actual or constructive) attention, reflects the understanding of the drafters of Article 4A.  *See* UCC § 4A-207 cmt. 2 (stating that the predecessor to § 1-202(f) "states rules for determining when an organization has *knowledge* of *information received* by the organization") (emphasis added).

[61] It may also ultimately be necessary or appropriate for the Court and parties to consider (*inter alia*) the doctrines of willful blindness, electronic or artificial agency, and the duty of good faith and fair dealing.  As to the first of these, *See* Docket No. 28 at ¶¶ 23-24 (asserting willful blindness theory and factual support therefore).  *See generally Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U. S. 754, 769 (2011) ("While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."); *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 190 (2020) (suggesting evidence of "willful blindness" in accordance with *Global-Tech* may support a finding of "actual knowledge"); *Marion v. Bryn Mawr Tr. Co.*, 288 A.3d 76, 92 (Pa. 2023) (although intentional ignorance is not "necessarily sufficient to satisfy the [actual] knowledge requirement", "evidence of intentional ignorance or willful blindness may support an inference of actual knowledge in particular cases"); *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 595 U.S. 178, 187 (2022), quoted in *Marion*, 288 A.3d at 91 ("willful blindness may support a finding of actual knowledge").  *Cf. Studco*, 2023 WL 1926747 at *14 (banks "cannot ignore their own systems to prevent fraud in order to claim that they did not have actual knowledge of said fraud").

As to the second, s*ee generally,* Chopra, Samir, and Laurence F. White. "Attribution of Knowledge to Artificial Agents and Their Principals." A Legal Theory for Autonomous Artificial Agents, University of Michigan Press, 2011, pp. 71–118. JSTOR, http://www.jstor.org/stable/10.3998/mpub.356801.7 (accessed Jul. 9 2024).  *See id.* at 85 ("[C]orporations increasingly acquire knowledge via artificial agents without any intervention by human agents of the corporation. For instance, . . . bank transactions may take place entirely online . . . . .  The pragmatic approach to information acquired by such means is to grant it the status of legally salient knowledge. Otherwise, the law confronts the conceptually incoherent situation of dealing with an entity that is able to act because of relevant information it has acquired (such as a bank or intermediary that sends automated notifications) but is not deemed to know that information for legal purposes.").  *Cf.* 73 Pa. Stat. § 2260.103 (defining "electronic agent" under the Uniform Electronic Transactions Act as "[a] computer program or an electronic or other automated means used independently to initiate an action or respond to electronic records or performances, in whole or in part, without review or action by an individual").

As to the third, *see* 13 Pa. C.S. § 1304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement."); 13 Pa. C.S. § 1201 (defining "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing.").  *See also Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1276 (11th Cir. 2003) ("Interpreting Article 4A in a manner that would allow a beneficiary bank to accept funds when it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for fraudulent activity.  It could hardly have been the intent of the drafters to enable a party to succeed in engaging in fraudulent activity, so long as it complied with the provisions of Article 4A.").

[62] In this regard, the Court respectfully disagrees with the district court in *Peter E. Shapiro, P.A. v. Wells Fargo Bank, N.A.*, 352 F. Supp. 3d 1226, 1233 (S.D. Fla. 2018), aff'd, 795 F. App'x 741 (11th Cir. 2019), which opined that the due diligence requirement from the predecessor to UCC § 1-202(f) did not apply because "no individual conducted the transaction; it was automated."  It appears to this Court that § 202(f) incorporates the principle that some individual must ultimately be deemed responsible for the conduct of transactions on behalf of a corporation and that more

identity or position of any individual who conducted the wire transfer at issue herein for PNC; doubtless the information required to do so is exclusively in PNC's possession.  If no individual retains an active role in the automated systems processing of most wire transfers, then it may be reasonable to hold the individual responsible for overseeing the processing platforms, supervising transaction exceptions/reconciliations, and/or pausing/stopping the transaction (if the bank wished to do so) to be the person "conducting" the transaction.[63]  In any event, Plaintiff has not alleged that knowledge of the mismatch was brought to any such person's attention; and accepting the SAC's allegations of the laxity of, or noncompliance with, PNC's verification and security procedures, its timely dissemination of such knowledge seems improbable.  The Court therefore concludes that the Church has not presently alleged facts which plausibly entail that knowledge of the mismatch actually was brought to the attention of the individual conducting the wire transfer prior to its completion.

The Court is left, therefore, with the question of whether (and when) such knowledge "would have been brought to the individual's attention if [PNC] had exercised due diligence".  13 Pa. C.S. § 1202(f).  As discussed above, section 1-202(f) provides that "[a]n organization exercises due diligence if it maintains reasonable routines for communicating significant information to the

---

generally the Code would not countenance a corporation externalizing risk of loss from its commercial transactions through system designs that utilize autonomous artificial electronic agents and omit any "individual" in charge.  *Cf. Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 488 n.23, 489 (3d Cir. 2013) (noting that Pennsylvania cases recognize liability for negligent supervision under Restatement (Second) of Agency § 213 (1958), which "provides, in relevant part" that "[a] person conducting an activity through servants or other agents is subject to liability . . . if he is negligent . . . in the employment of improper persons or instrumentalities . . . or . . . in the supervision of the activity").  Corporations are in large part free to structure their managerial or departmental hierarchies in whatever manner best suits their corporate interests; but it is essential to the law's plenary reach that each of a corporation's acts or omissions be overseen at some level by accountable agents with personhood.

[63] This might be, for example, the manager of the "wire room", or that person's subordinate in charge of a relevant subset of transactions; or an information technology employee responsible for running the bank's automated fund transfer software; or an employee/analyst responsible for recipient account verification or Bank Secrecy Act / Office of Foreign Assts Control ("OFAC") compliance.  *Cf.* n.6, *supra* (noting PNC's current use of systems analysts and recipient account verification procedures for fund transfers originating from PNC).

person conducting the transaction and there is reasonable compliance with the routines."  *Id.* Under this provision, the question of whether PNC's knowledge of the mismatch was effective for the wire transfer depends on whether a policy that fails to distribute or direct such information to the wire room (or other person conducting the transfer) is reasonable.

The few reported decisions to have addressed what constitutes a "reasonable routine" for communicating significant information that bears on the risk of a wire transfer misidentification[64] have reached quite different conclusions.  *Compare Studco*, 2023 WL 1926747 at *14 (finding bank "did not maintain reasonable routines for communicating significant information to the person conducting the transaction" where bank "ignored all warnings generated by their systems . . . for . . . detecting fraudulent or suspicious activity", and thus "did not maintain any routines, let alone reasonable routines," for communicating such information), *with Shapiro*, 795 F. App'x at 748-49 ("easily conclud[ing] that [the bank] maintained and complied with reasonable routines"

---

[64] In addition to *Studco* and *Shapiro* (addressed in detail, *infra*), the Court is aware of two additional cases from within the Eleventh Circuit that reach the same conclusion as *Shapiro*.  *See Julio J. Valdes, M.D., P.A. v. Customers Bank, Inc.*, 830 F. App'x 598, 601 (11th Cir. 2020) (holding use of "automated system that read only the number of the designated bank account" constitutes reasonable routine under predecessor to § 1-202(f)); *Powis Parker, Inc. v. Truist Bank*, No. 6:22-CV-1269-WWB-RMN, 2024 WL 945365, at *5 (M.D. Fla. Mar. 5, 2024) (holding that "the Eleventh Circuit has established that it is not unreasonable for banks to allow their automated wire transfer systems to rely on account number only" (citing *Valdes*); and consequently that because the bank utilized an automated payment system, "it has met its initial burden of proving that it implemented a reasonable routine and hence acted with due diligence"); *id.* (opining that "the due diligence requirement of [the predecessor to § 1-202(f)] extends only to the 'individual conducting the transaction,' [and] does not contemplate the conduct of the bank at the time it opened the account.").

There are also several reported cases that cite or quote from § 1-202(f) in the context of a § 4A-207(b)(2) claim, but do not address the requisites of a reasonable communication routine.  *See Squeeze Me Once, LLC v. SunTrust Bank*, No. CV 19-787-JWD-RLB, 2020 WL 12968001, at *14-15 (M.D. La. Aug. 3, 2020) (quoting § 1-202(f); holding that pleading alleging that bank had actual knowledge of mismatch "upon receipt of the transfer order" contains "sufficient factual allegations to state a claim for violation of Article 4A"); *Simple Helix, LLC v. Relus Techs., LLC*, 493 F. Supp. 3d 1087, 1099 n.10, 1100 n.15, 1104 (N.D. Ala. 2020) (quoting § 1-202(f) in footnote and "assum[ing] . . . Complaint plausibly alleges [bank] possessed actual knowledge of the discrepancy as defined in [§§ 1-202(b) and (f)]", but dismissing complaint because plaintiff, the intended beneficiary, was not a party to the wire transfer); *Hirt v. Wells Fargo Bank, N.A.*, No. 4:20-CV-1616, 2021 WL 536514, at *2 (S.D. Tex. Jan. 5, 2021), report and recommendation adopted, No. 4:20-CV-1616, 2021 WL 515037 (S.D. Tex. Feb. 11, 2021) (citing and paraphrasing, but not addressing, § 1-202(f)); *Madison Title Agency, LLC v. Bank of Am., N.A.*, 672 F. Supp. 3d 1313, 1316 & n.6 (N.D. Ga. 2023), *appeal dismissed*, No. 23-11742-H, 2023 WL 8272015 (11th Cir. Sept. 21, 2023) (citing § 1-202(f) in footnote; holding bank employees' alleged knowledge "that technology readily available and easily implemented would have identified the obvious name mismatch" did not create inference of bank's actual knowledge of mismatch).

by "us[ing] an automated system that processed payment orders on the basis of a matching account number alone, ignoring potential name mismatches automatically reflected in the audit trail").[65] *Studco*'s rationale is, most fundamentally, that ignoring information is the antithesis of communicating it.  *Shapiro*'s rationale is, most fundamentally, that the statute intended to facilitate electronic finance by exempting banks from liability upon full number-based automation of their wire funds transfer processing.  This Court is inclined to agree with the assessment of *Studco* that a policy of ignoring potential name mismatches (and the potential fraud they may portend) is not *per se* reasonable.

### e.  A Bank May Have Actual Knowledge of a Mismatch Pursuant to Section 4A-207(b) Despite Its Automated Processing of a Funds Transfer.

*Shapiro* advances two principal rationales for its holding, one based on text and the other on policy.[66]  As to text, under UCC § 4A-207(b)(1) a beneficiary bank may "rely on the number

---

[65] PNC asserts that its use of "an automated process that reviews only the account number" is "customary in the banking industry".  (Docket No. 34 at 6).  *See also* UCC § 4A-207 cmt. 2, *quoted in Shapiro*, 795 F. App'x at 748 ("the clear trend is for beneficiary's banks to process payment orders by automated means").  But the fact that such a process may be "customary" does not entail that it is reasonable.  As Judge Learned Hand explained in a celebrated passage:

> Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices.  It never may set its own tests, however persuasive be its usages.  Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*The T.J. Hooper*, 60 F.2d 737 (2d Cir. 1932), *cited in Jones v. Three Rivers Management Corp.*, 394 A.2d 546, 551 n.6 (Pa. 1978).  *See also Welsh v. Kleiderer*, 296 A.2d 746, 747 (Pa. 1970) ("The 'custom or practice of the industry' standard of care is a relic of a bygone age and . . . has been roundly criticized and generally disapproved.") (citing, *inter alia*, *The T.J. Hooper*); *Banco Multiple Santa Cruz, S.A. v. Moreno*, 888 F. Supp. 2d 356, 375 (E.D.N.Y. 2012) (citing and quoting *The T.J. Hooper* in discussion of standard of care owed by banks and annuity companies for protection of depositors' accounts).

The import of an assertion that automation of wire transfer processing absolves the bank of any legal responsibility to participate in risk-of-loss reduction by, *e.g.*, reasonable communication of institutional knowledge, is explored *infra*.

[66] In addition to *Shapiro*, this Court is aware of several cases that have in effect held – albeit without addressing imputation of knowledge under § 1-202(f) – that use of an automated wire transfer system without human intervention insulates a bank from actual knowledge of a misidentification.  *See, e.g.*, *Grand Bayman Belize, Ltd. v. Wells Fargo & Co*, 514 F. Supp. 3d 1188, 1193 (C.D. Cal. 2021), *aff'd*, No. 21-55146 (9th Cir. Jan. 14, 2022)  (because bank "processed the Wire Transfer automatically, without human intervention, based on the account number," it had no actual knowledge of the mismatch); *Squeeze Me Once*, 630 F. Supp. 3d at 775 ("Since it is undisputed that there was no manual intervention or review prior to the wire transfer order, [the bank] did not have actual knowledge of the

as the proper identification", and "need not determine whether the name and number refer to the same person".   The *Shapiro* court reasoned therefrom that, "[b]ecause the statute expressly permit[s the bank] to [process orders on the basis of account number alone], we cannot conclude that [the bank] failed to maintain a reasonable routine."  *Shapiro*, 795 F. App'x at 748.[67]  As to

---

misdescription".); *Hirt*, 2021 WL 536514, at *1 ("Section 4A.207(b)(1) states that where . . . the fund transfer is processed in a fully automated way, the beneficiary's bank may rely on the information it has received and need not determine whether the name and account number identify the same person."); *id.* at *2 (if "the funds were deposited via an automated wire transaction . . . . , § 4A.207(b)(1) would apply to the transaction"); *Skin Studio Day Spa, LLC v. Wells Fargo Bank, NA*, No. 3:23-CV-2111-SAL, 2024 WL 503666, at *3 (D.S.C. Jan. 9, 2024) (finding complaint does not allege any facts to support assertion of actual knowledge, where bank "'chooses to fully automate the receipt' of wire transfers, does not monitor for 'name/account number mismatches[,]' and 'ignore[s] mismatches between account names and account numbers on inbound' transactions') (brackets in original).  *But see Studco*, 2023 WL 1926747 at *14 (holding that "[a]ctual knowledge of the misdescription can be imputed" despite bank's use of system that "automatically deposited the incoming funds without human involvement" because if bank had "implemented reasonable routines for communicating information," circumstances "would have alerted [bank] to the misdescription").

PNC contends that because it "processed the wire transfer at issue by automatic means relying only on the account number," it "had no actual knowledge of any mismatch between the account number and beneficiary name." (Docket No. 34 at 19).  However, as discussed *infra*, this Court does not interpret § 4A-207(b), read in light of § 1-202(f), to preclude a finding of actual knowledge on the part of a bank that utilizes an automatic payment system.  In any event, the precise nature of PNC's wire transfer process is not presently before the Court. *Cf. Hirt*, 2021 WL 536514, at *2 ("The facts of the Complaint do not establish that the funds were deposited via an automated process and Defendant has not directed the Court to other information which could be considered at the motion to dismiss stage.").

[67] Stated more fully, the *Shapiro* court reasoned as follows:

> [T]he proper resolution of this case depends on (1) whether an individual person had actual knowledge of the fact that the [bank] account number identified in [the] payment order actually belonged to [the thief] and not to [the intended beneficiary], or (2) even if no individual person had actual knowledge of the name mismatch, whether [the bank's] failure to communicate information from its automated audit trail regarding a potential name mismatch to an individual person means it failed to exercise due diligence and thus should be deemed to have knowledge of the mismatch.
>
> . . . .
>
> [N]o individual person . . . had actual knowledge of the name mismatch before [the bank] approved [the] funds transfer and placed the funds in [the thief's] account.  Thus, . . . we must determine whether knowledge of the name mismatch should be imputed to [the bank] because it failed to exercise due diligence within the meaning of [§ 1-202(f)] by implementing and using an automated funds transfer system that ignores potential name mismatches. Stated in the relevant language of the statute, the question we must answer is did [the bank] "maintain[ ] reasonable routines for communicating significant information to the person conducting the transaction" and then reasonably comply with that routine?
>
> . . . .
>
> Considering the clear intention of the statute, which is to allow for the automated processing by banks of a large number of payment orders on a daily basis, while reducing both transaction costs and the potential for clerical error, we easily conclude that [the bank] maintained and complied with reasonable routines, and thus exercised due diligence, with respect to the processing of [the] payment order through its automated MTS.  In reaching this conclusion, we emphasize that [§ 1-

---

policy, the court was persuaded by the comments to the foregoing UCC section, which observed that "[m]anual handling of payment orders is both expensive and subject to human error" and cautioned that if the beneficiary's bank is required "to determine whether the name and number refer to the same person, . . . the benefits of automated payment are lost."  UCC § 4A-207 cmt. 2, *quoted in* Shapiro, 795 F. App'x at 747; *see also* Section V(A) & n.20, *supra*.  The Eleventh Circuit thus concurred with the district court therein that a due diligence standard which it read to require the bank "to put in place systems to catch name mismatches" would "undermine the express purpose of Article 4A by reinserting human review into a process which is intended to be quick and automated."  *Shapiro*, 352 F. Supp. 3d at 1233; Shapiro, 795 F. App'x at 749.  This Court finds itself in disagreement with the Eleventh Circuit's opinion, on the following three grounds:

> **i.   A Bank's Lack of Knowledge of Mismatch Must Be Determined Prior to Affording It "Safe Harbor" Treatment under Section 4A-207(b)(1)**

First, as to *Shapiro's* textual rationale, that ignoring potential name mismatches is reasonable *per se* because section 4A-207(b)(1) permits it:  by its unambiguous terms, section 4A-207(b)(1) operates to excuse a bank from liability for a fund transfer diversion to an unintended beneficiary *only* when the bank lacks knowledge of the mismatch/misidentification.  And as *Shapiro* recognizes, section 1-202(f) "operates to impute organizational knowledge . . . when an

---

202(f)] operates to impute organizational knowledge only when an organization fails to maintain "reasonable routines for communicating significant information" to the person conducting the transaction. In processing the payment order . . . , it was not unreasonable for [the bank] to allow its automated payment system to ignore a potential name mismatch and "rely on the number as the proper identification of the beneficiary of the order."  [§ 4A-207(b)(1)].  Indeed, this is expressly allowed by [§ 4A-207(b)].  *See id.* ("The beneficiary's bank need not determine whether the name and number refer to the same person."). Because the statute expressly permitted [the bank]to do that, we cannot conclude that [the bank] failed to maintain a reasonable routine.

Shapiro, 795 F. App'x at 746-48.

organization fails to maintain 'reasonable routines for communicating significant information.'" 795 F. App'x at 748.[68]

Thus, an assessment of (a) the bank's possession of significant knowledge and, as warranted, (b) its communication practices, must be made to determine its entitlement to rely solely on the account number.  In looking directly to section 4A-207(b)(1), *Shapiro* omits consideration of the statutory conditions precedent to its applicability.[69]   Under the resultant framing, the bank's routine (reliance on number alone) is reasonable because section 4A-207(b)(1) permits it; section 4A-207(b)(1) applies because the bank does not know of a misidentification; and it is not charged with knowledge of a misidentification under section 1-202(f) because its routine is reasonable.[70]

This Court believes that a more fitting statutory construction mandates a straightforward application of section 4A-207(b)(1) and requires a threshold determination of whether a bank has knowledge of a mismatch (under the due diligence standard of section 1-202(f)), without anticipatory reference to the implications of section 4A-207(b)(1) if it is found to apply.

---

[68] *See also Shapiro*, 795 F. App'x at 746–47 ("[E]ven if no individual person had actual knowledge of the name mismatch, [the proper resolution of this case depends on] whether [the bank's] failure to communicate information from its automated audit trail regarding a potential name mismatch to an individual person means it failed to exercise due diligence and thus should be deemed to have knowledge of the mismatch.").

[69] In effect, *Shapiro* affords banks the protection of the statutory "safe harbor" (as it is designated in the case law) for sole reliance on the account number, without requiring that they navigate into that harbor by exercising due diligence in the dissemination of information (in order not to be charged with knowledge of what should have been communicated).  *See TME Enterprises, Inc. v. Norwest Corp.*, 22 Cal. Rptr. 3d 146, 153-54 (Cal. App. 2004) (UCC § 4A–207(b) "provides, in effect, immunity from responsibility—a 'safe harbor'—for a beneficiary's bank that relies on the account number specified in a wire transfer order to identify the beneficiary of the order.  The safe harbor provision applies so long as the bank does not know that the beneficiary's name and account number refer to different persons.").

[70] *See, e.g., Cherry v. Pa. Higher Educ. Assistance Agency*, 642 A.2d 463, 466 (Pa. 1994) (discussing logical fallacy of *petitio principii*).

### ii. Holding that Automated Processing Without Human Intervention Precludes Actual Knowledge of Mismatch Would Read Section 4A-207(b)(2) Out of the Code

Second, the *Shapiro* court's interpretation of section 4A-207(b) (whether based on text or on policy) appears to have the impermissible effect of reading section 4A-207(b)(2) out of the statute. The latter section assigns the loss on a diverted funds transfer to the beneficiary's bank if it processes the transaction despite knowledge of a mismatch between the account name and beneficiary name. Yet under *Shapiro*'s interpretation, a beneficiary's bank's use of an automated payment system seemingly serves as a free pass. That is, by precluding actual or effective knowledge of mismatches, it renders section 4A-207(b)(2) inapplicable (and thus exempts the bank from transactional liability for diversion of wired funds) whenever the bank uses an automated funds transfer system. In this Court's estimation, such an exemption is so broad as to swallow up the rule, because it would apply to nearly all wire transfers.

Already in the late 1980s, as Article 4A was being drafted, the drafters and adopting legislatures were aware that "[a] very large percentage of payment orders . . . [were] processed by automated means . . . . without human reading of the payment order itself" and recognized the "clear trend" from manual toward automated processing. UCC § 4A-207 cmt. 2, *quoted in Shapiro*, 795 F. App'x at 747-48.[71] This Court is reluctant to presume that the otherwise prescient drafters of Article 4A (or the enacting legislatures) intended such an ultimately sweeping exemption from a core provision in a comprehensive and reticulated division of the Code. *See*

---

[71] PNC acknowledges that automated processing has become so prevalent as to have become "customary in the banking industry." (Docket No. 34 at 6).

The drafters also understood that funds transfers were "a product of recent and developing technological changes." UCC § 4A-102 cmt. Indeed, technology has progressed to the point that they are completed within seconds of an order being transmitted to the beneficiary's bank. *See Grand Bayman Belize*, 514 F. Supp. 3d at 1193 (detailing automated processing of payment order, from receipt to payment, including internal and external reviews, all within approximately seven seconds).

*Tr. Under Agreement of Taylor*, 164 A.3d 1147, 1157 (Pa. 2017) ("We must presume that in drafting the statute, the General Assembly intended the entire statute, including all of its provisions, to be effective. 1 Pa. C.S. § 1922.  Importantly, this presumption requires that statutory sections are not to be construed in such a way that one section operates to nullify, exclude or cancel another, unless the statute expressly says so.").[72]

### iii. Screening for Name Mismatches Would Not Require Banks to Forego the Benefits of Automatic Payment

Third, *Shapiro*'s policy rationale – that *any* effort by a bank to combat wire transfer fraud would require human review and handling of payment orders, causing the benefits of automated payment to be lost – reflects the court's consideration of contemporaneous commentary.  This Court has, however, substantial doubt that technological barriers to context-sensitive automated screening(s) for name mismatches (*i.e.,* a process ultimately requiring human review and handling only in a small subset comprised of high-risk cases)[73] remain today, particularly as society embarks upon what promises to be an explosion in the utilization of artificial intelligence. *Shapiro* acknowledges that in light of the capabilities of modern technology "one can reasonably question the wisdom of the rule" it applied, but resolves this concern with the observation that "arguments that certain provisions of Article 4A are unwise or lead to unjust results are for the . . . [l]egislature . . . to consider." *Shapiro*, 795 F. App'x at 749 n.9.  This Court concurs that courts are bound to apply the *text* of a statute as written (until such time as the legislature may see fit to amend it),

---

[72] *See also, e.g.*, *Ball v. Chapman*, 289 A.3d 1, 26–27 (Pa. 2023) ("the rule against superfluities . . . .  instructs courts to construe a statute's language 'so that effect is given to all its provisions, [and] so that no part will be inoperative or superfluous, void or insignificant") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009) (brackets in *Ball*); *PJM Power Providers Grp. v. FERC*, 88 F.4th 250, 268 (3d Cir. 2023), amended sub nom. *PJM Power Providers Grp. v. FERC*, No. 21-3068, 2024 WL 259448 (3d Cir. Jan. 24, 2024) (noting courts' responsibility to "avoid interpreting statutory provisions in ways that . . . leave entire operative clauses with no job to do") (internal quotation marks omitted).  *Cf. United States v. Hood*, 343 U.S. 148, 151 (1952) ("[W]e should not read out what as a matter of ordinary English speech is in").

[73] *Cf.* n.81, *infra* (discussing stratification of risk).

even if it appears that developments since the statute's passage may have rendered it unwise or unjust.  But it does not believe the courts are further bound to preference suppositions articulated in the comments by according them controlling weight in judicial interpretations of the text.  This is especially so when the policy reflected in the commentary is brought to bear on a standard such as reasonableness, which by its nature is situational rather than static.[74]  A communication policy that may have been reasonable 35 years ago may well be unreasonable today, when interim advances in technology have dramatically and irrefutably reduced the cost and delay attendant on transaction processing ("TPS") applications, including execution of operations such as name-matching, analyzing usage patterns, etc., and the production of related outputs, such as reports, decisions or changes in data states.[75]

### iv. Determining the Reasonableness of a Communications Routine Depends on Balancing Burdens and Benefits

Having declined to follow the *Shapiro* court's interpretation of § 4A-207(b)(1) as conferring *per se* reasonableness on a bank's policy of ignoring potential name mismatches, it remains for this Court to address the appropriate standards for determining reasonableness under Pennsylvania law.  As a threshold matter, what is required to make a routine for communicating information "reasonable" under the circumstances presents a quintessential jury question.  As the Court of Appeals for the Third Circuit explained long ago,

> It is always a question for the jury when the measure of duty is ordinary and reasonable care. In such cases the standard of duty is not fixed but variable. Under some circumstances a higher degree of care is demanded than under others. And when the standard shifts with the circumstances of the case, it is in its very nature

---

[74] In a rapidly evolving environment, public policy can be an inconstant and hence potentially unreliable touchstone for statutory interpretation.  *See Sinn v. Burd*, 404 A.2d 672, 681 (Pa. 1979) (considerations of policy which inform a court's determination of a duty of care are "shifting sands, and no fit foundation") (quoting Prosser, *Palsgraf Revisited*, 52 Mich.L.Rev. 1, 14-15 (1953).

[75] *See* 13 Pa. C.S. § 1103 (The UCC "is drawn to provide flexibility . . . . It is intended to make it possible for the law embodied in the [UCC] to be applied by the courts in the light of unforeseen and new circumstances and practices.").  *Cf. United States v. Rahimi*, 144 S. Ct. 1889 (2024) (eschewing "a law trapped in amber").

incapable of being determined as matter of law, and must be submitted to the jury to determine what it is, and whether it has been complied with.

*Bush v. Hunt*, 209 F. 164, 170 (3d Cir. 1913), quoting *W. Chester & P.R. Co. v. McElwee*, 67 Pa. 311, 315 (1871). More recently, the Pennsylvania Superior Court has carefully delineated the difference between the existence of a duty under the law (here, the obligation to maintain and comply with "reasonable routines" for communicating information) and the standard of care, or "contours" of that duty (here, what is or is not required for a routine to be reasonable):

> [I]n all but extraordinary cases, establishing the applicable standard of care, or if one prefers, the **contours** of the general duty recognized in the first instance by the court, requires expert testimony and presents a question of fact for the jury. . . . . If we allow the trial court to import into the duty inquiry a determination as to the precise standard of care at issue, and implicitly to decide on summary judgment that the standard has not been breached, we take from the jury its prescribed role . . . . The integrity of the time-honored delineation of what belongs to the court and what belongs to the jury can be preserved only by separating . . . **general** duty . . . from the elucidation of how that duty is to be fulfilled in a given case, which concerns the particular standard of care . . . . The latter inquiries require a jury determination.

*K.H. ex rel. H.S. v. Kumar*, 2015 PA Super 177, 122 A.3d 1080, 1097 (2015) (emphasis in original).[76]

Under the foregoing authorities, it is not for a court to say, without consulting a jury, whether a policy of ignoring information about potential name mismatches constitutes a "reasonable routine for communicating" that information. *Compare Studco*, 2023 WL 1926747, at *13 (finding, *in its role as factfinder*, based upon "the evidence at [a bench] trial", that bank that simply ignored warnings about potential mismatches "did not maintain reasonable routines for communicating significant information").

---

[76] *See also, e.g., Maas v. UPMC Presbyterian Shadyside*, 2018 PA Super 195, 192 A.3d 1139, 1144 (2018), *aff'd*, 234 A.3d 427 (Pa. 2020) (although the existence of a duty of care is a question of law for the court, "the applicable standard of care [and] whether it was breached . . . are questions of fact for the jury") (citing, *inter alia, Kumar*).

Finally, under Pennsylvania law, determining the reasonableness of a bank's information dissemination depends on balancing the risk or cost of potential wire transfer fraud against the burdens of using available information to guard against it.  *See Clewell*, 121 A.2d at 463, quoting Restatement of Torts § 291(1) ("Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done").  *See generally Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 389-90 (Pa. 2014) (discussing risk-utility test in context of products liability).  As the Pennsylvania Supreme Court then observed, "Pennsylvania [applies] a test balancing risks and utilities or, stated in economic terms, a cost-benefit analysis" which asks whether "the probability and seriousness of harm . . . outweigh the burden or costs of taking precautions."  *Id.*, 104 A.3d at 389.[77]

Applying these standards in the present case, the Court finds it plausible that the Church may sustain its burden to establish that a reasonable dissemination policy would result in PNC's effective knowledge of the mismatch.  As set out above*,* this assessment essentially entails balancing the risks and costs of fraudulent diversions against the burden on the bank of using information uniquely available to it to curtail such fraud.[78]  On the one hand, the incidence and

---

[77] *See also Tincher*, 104 A.3d at 390 ("Judge Learned Hand's formula . . . succinctly captures the common sense idea that . . . dangers that might cost-effectively (and practicably) be removed" are unacceptable, so that liability turns on whether a defendant "fails to adopt a burden of precaution of less magnitude than the harm it is likely to prevent.") (internal quotations and citations omitted).

[78] The SAC alleges that (a) shortly after the Account's opening the required IRS tax identification submission would have noted a discrepancy, (b) "suspicious account" warnings had been triggered by PNC's automated account monitoring systems thereafter; (c) PNC was required to file related reports with the federal Financial Crimes Enforcement Network ("FinCEN"); and (d) PNC "conducted further enhanced due diligence of the Account, which further alerted" it to the Account's fraudulent name. (Docket No. 28 at ¶¶ 18-22).

 Information generated by the foregoing processes, together with other account history information, serves a dual function in the § 1-202(f) analysis: informing the risk analysis implicit in setting a reasonable communication routine while also potentially comprising significant information to be communicated under such a routine.

cost of preventable wire transfer fraud are substantial and increasing;[79] and the human or social costs, as exemplified by the present case, can be tragic.  On the other hand, the burden on the beneficiary's bank to screen against such fraud appears to be low (and declining with advances in technology).  Thus, for example:

Because automated screening appears to be increasingly efficient, fast and inexpensive,[80] while human/manual review may be expected to introduce cost and delay, a reasonable routine for communication of significant information might commence with an automated screening to assess a transaction's risk level, and then "elevate" the information through potential further screening, and ultimately to the attention of the human agent conducting the transaction if and when the risk meets criteria for intervention.[81]

Moreover, the information required to conduct this risk assessment may be readily accessible to the bank's automated processing system:  The amount of the transfer, the account number and the intended beneficiary's name all routinely appear on the face of the payment order; and the account name and history are presumably in records linked to the account number, which the system must access in order to verify the account number prior to accepting the transfer order.

---

[79] *See, e.g.*, 2022 IC3 Report at 11 ("In 2022, the [Internet Crime Complaint Center] received 21,832 [Business Email Compromise (BEC)] complaints with adjusted losses over $2.7 billion. BEC is a sophisticated scam targeting both businesses and individuals performing transfers of funds."); *see also* n.6, *supra*.

[80] *See e.g., Grand Bayman Belize,* 514 F. Supp. 3d at 1193 (sending wire transfer order to external application for screening pursuant to the Office of Foreign Assets Control ("OFAC") took less than 4 seconds).

[81] Given that the risk of fraud attendant on wire transfers is stratified based on objective factors (such as the amount of the transfer, the history of the receiving account's formation and usage, and the extent of a name mismatch), the bank's standard of care may also be stratified according to such risk.  *See e.g., Shapiro*, 795 F. App'x at 749 n.9 ("[M]odern technology probably is capable of easily differentiating between a partial mismatch . . . and a complete mismatch"); *Studco*, 2023 WL 1926747, at *14 (finding bank should have had system to sort out and escalate warnings related to "high-value transactions").

The risk-stratified compliance procedures contemplated by OFAC provide a useful example.  *See* Bank Secrecy Act / Anti-Money Laundering Manual, Office of Foreign Assets Control, https://bsaaml.ffiec.gov/manual/OfficeOfForeignAssetsControl/01 (accessed July 13, 2024) ("The screening criteria used by banks to identify name variations and misspellings should be based on the level of OFAC risk associated with the particular product or type of transaction.").

Indeed, as the bank already must access much of the same information to screen for regulatory compliance, it likely could include automated screening for fraud risk without adding significant cost or delay.[82]  In sum, a jury might well find that a reasonable routine for communication of significant information requires both initial automated screening(s), and further escalation to human review (despite some attendant cost and delay) in circumstances found by the automated system to entail a high risk of fraud.[83]  Accordingly, the Court finds for purposes of the present motions that Plaintiff has sufficiently stated a claim under section 4A-207(b)(2) of the UCC.

### 3.  The SAC Plausibly Supports a Claim Pursuant to UCC Section 4A-207(c) Predicated on FNB's Alleged Failure to Provide Notice

#### a.  The SAC Expressly or Impliedly Alleges Each of the *Prima Facie* Elements of EVBC's Claim

A wire transfer originator's successful assertion of a claim against the originator's bank under UCC section 4A-207(c) requires that it establish seven *prima facie* elements, and that its bank fail to establish one affirmative defense.  For ease of reference, because the elements are spread across several subsections of section 207 (and because supporting allegations are dispersed across multiple paragraphs of the SAC), the elements and affirmative defense are restated here, verbatim and in order, but separated and numbered:

[If the originator proves that:]

[i] [A] payment order received by the beneficiary's bank identifies the beneficiary both by name and by an identifying or bank account number and the name and number identify different persons;[84]

---

[82]  *See* n.11, *supra*; *see generally Lewis, Allocation of Loss*, 90 Mich. L. Rev. at  2574 ("[T]he beneficiary's bank could have prevented the loss without seriously undercutting the benefits of automation.").

[83]  Indeed, for a transaction particularly fraught with risk, such as a large funds transfer into a recently opened account with questionable identity verification, a suspicious usage pattern and a complete name mismatch – all of which could be present here – it might even be that a reasonable jury could not find otherwise.

[84]  This language from § 207(b) is incorporated in § 207(c) by virtue of its reference to "a payment order described in subsection (b)".  As to the SAC's allegations with respect to this element, *see* Docket No. 28 at ¶¶ 8-9, 58 ("PNC received a payment order for the benefit of Landmark Builders, Inc. with account number ******8034", which number identified an account "in a name other than 'Landmark Builders, Inc.'").  *See also id.* at ¶¶ 59-60.  *Cf.* n.48, *supra*

[ii] [said order] is accepted;[85]

[iii] the originator's payment order described the beneficiary inconsistently by name and number;[86]

[iv] the beneficiary's bank pays the person identified by number;[87]

[v] the beneficiary's bank does not know that the name and number refer to different persons;[88]

[vi] the originator is not a bank;[89] [and]

[vii] the person identified by number was not entitled to receive payment from the originator;[90]

[then] the originator is not obliged to pay its order unless the originator's bank proves that[:]

[viii] the originator, before acceptance of the originator's order, had notice that payment of a payment order issued by the originator might be made by the beneficiary's bank on the basis of an identifying or bank account number even if it identifies a person different from the named beneficiary.

UCC §§ 4A-207(b), (c).

---

(recognizing that quoted allegation as to account name is stated in the alternative).

[85] *See* Docket No. 28 at ¶ 36 ("PNC took custody of the $793,376.10 on or around November 7th, 2022"); UCC § 4A-209(b)(2) (acceptance by beneficiary's bank occurs, at the latest, "when the bank receives payment of the entire amount of the sender's order").

[86] *See* Docket No. 28 at ¶¶ 8-9, 33, 35 ("In the Wire, EVBC identified the beneficiary's name as 'Landmark Builders, Inc.'", and "identified the beneficiary's account number as ******8034.")

[87] *See* Docket No. 28 at ¶¶ 8, 43, 55 (PNC "deposited the transfer from EVBC into the Account" identified by number ******8034).

[88] This language from § 207(b)(1) is incorporated in § 207(c) by virtue of its reference to payment "as permitted by subsection (b)(1)".  Although the SAC does not explicitly allege PNC's lack of knowledge of the name discrepancy, and indeed repeatedly alleges PNC's actual knowledge thereof, the Court deems the SAC's express assertion of a "Violation of 13 Pa. C.S. § 4A207(c)(2)" to amount to an allegation in the alternative that PNC did not know of the discrepancy, and hence that its payment into the Account was "as permitted by" § 207(b)(1).

[89] Although the SAC does not explicitly allege that EVBC is not a bank, the Court deems this element to be implicit in the SAC's allegation that EVBC is "a religious Nonprofit Corporation".  (Docket No. 28 at ¶ 1).

[90] *See* Docket No. 28 at ¶¶ 62, 86 ("EVBC had no obligations to" the entity assigned with the Account ******8034).

As shown in the footnotes to the various elements, Plaintiff has sufficiently and plausibly alleged each of the *prima facie* elements of its claim under section 207(c).  In moving for dismissal, FNB does not dispute any of these elements, but instead concentrates on its affirmative defense, as it contends that the T&C appended to its OWF conclusively establish that the Church received notice that payment might be made based on the account number alone.

### b.  The Terms and Conditions Submitted by FNB are *Dehors* the Record

As a threshold matter, the parties dispute whether the T&C may be considered by the Court in ruling on FNB's motion to dismiss.  FNB acknowledges that the Court generally "may not consider matters extraneous to the pleadings" but argues that the OWF and T&C may be considered as collectively comprising "an undisputedly authentic document" that is "integral to or explicitly relied upon in the complaint".  Docket No. 39 at 10, quoting *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) and *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

The Court readily considers the one-page OWF as implicitly incorporated within the SAC, as it corresponds precisely to the SAC's recitations of the date, amount, and beneficiary's name, address and account number in a payment order referred to therein as the "Wire";[91] EVBC's claims against FNB appear to be predicated in substantial part on the OWF's inclusion of the beneficiary's name and address;[92] and EVBC does not, in its briefing, dispute the authenticity or authorization thereof.[93]  Whether the Court may also consider and apply the T&C is another matter.  No part of

---

[91] *Compare* Docket No. 28 at ¶¶ 31, 33-35 *with* Docket No. 39-1 at 2.  The Court notes that the SAC appears to use the defined term "Wire" to refer both to the payment order that initiated the funds transfer and to the transfer itself.

[92] *See* Docket No. 28 at ¶¶ 82-84.

[93] *See* Docket No. 40 at 8 ("Defendant has attached an 'Outgoing Wire Form' . . . signed by Steve Owings dated 11/7/2022, which shows the wire information as alleged by [EVBC] . . . .  [and] appears to be a copy of actual signatures".).

the T&C is recited in the SAC or relied upon for the claims asserted therein,[94] and EVBC expressly disputes its authenticity.[95]

In disputing authenticity, EVBC points out that unlike the OWF, the T&C lack three-hole punch marks (indicating they were not kept in the same physical file), bear a different (and very recent) date, and exhibit HTML printing artifacts.  (Docket No. 40 at 8-9).  FNB responds by submitting the August 2, 2024 Affidavit of its Electronic Banking – Wires Supervisor, Vanessa Reiser, which addresses these apparent discrepancies and seeks to authenticate the T&C as a component of the signed OWF.  (Docket No. 43-2).  Because it cannot be supposed that Ms. Reiser's Affidavit was integral to or relied upon in the SAC (which pre-dated the Affidavit), it may not be considered in ruling on FNB's motion to dismiss.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  For the reasons discussed in subsections (c) and (d) below, the Court declines to convert FNB's pending motion to one for summary judgment.

### c.   Key Averments in the Affidavit Submitted by FNB Have Not Been Shown to be Based on Personal Knowledge.

Conversion of FNB's motion to one for summary judgment in order to consider the Affidavit and its proffered authentication of the T&C would be of no avail to FNB, as the Affidavit fails to meet the requirements of Fed. R. Civ. P. 56.  In particular, Rule 56(c)(4) provides that an affidavit used to support a motion for summary judgment "must be made on personal knowledge".  The courts have held that such an affidavit "must not only be based on the affiant's personal knowledge but it must ***show*** that the affiant possesses the knowledge asserted."  *Bowers v. Rector*

---

[94] *See* Docket No. 28, *passim*.

[95] *See* Docket No. 40 at 9 ("The alleged terms and conditions are disputed as authentic.").

*& Visitors of Univ. of Va.*, No. 3:06CV00041, 2007 WL 2963818, at *5 (W.D. Va. Oct. 9, 2007) (collecting cases), *quoted in Subh v. Wal-Mart Stores E., LP*, No. CA 07-479-SLR-LPS, 2009 WL 866798, at *10 (D. Del. Mar. 31, 2009), *report and recommendation adopted,* 2009 WL 3153511 (D. Del. Sept. 30, 2009), *aff'd*, 386 F. App'x 29 (3d Cir. 2010) (emphasis added).  "[T]here is no requirement for a set of magic words [to show personal knowledge].  Instead, it is enough that the matters attested to would, in fact, be within the sphere of [the affiant's] own knowledge." *Herbert v. Pouya*, No. 2:20-CV-1413-NR, 2021 WL 1737463, at *4 (W.D. Pa. May 3, 2021) (internal quotation marks and citation omitted); *see also Papariello v. Absolute Resols. Invs., LLC*, No. CV 21-314, 2024 WL 756935, at *5 (W.D. Pa. Feb. 20, 2024) (same).  Case law indicates that the sphere of an affiant's knowledge may be established by descriptions of the affiant's job title and responsibilities.  *See, e.g.*, *PNC Bank, Nat'l Ass'n v. Ruiz*, No. 22-50584, 2023 WL 3340078, at *3 (5th Cir. May 10, 2023) ("Personal knowledge can be demonstrated by showing that the facts stated reasonably fall within the sphere of responsibility of the affiant as a corporate employee.") (internal quotation marks and citation omitted).[96]

Ms. Reiser's Affidavit recites that she is employed as FNB's "Electronic Banking – Wires Supervisor" and that since August 14, 2023 she has been responsible for overseeing the retention of OWFs and corresponding T&C.  (Docket No. 43-2 at ¶¶ 2, 3).  This position and responsibility presumably give her personal knowledge as to FNB's scanning and storage of wire forms, its document management website and the downloading of T&C, as set forth in paragraphs 5, 6, 8 and 9 of her Affidavit.  Her personal knowledge as to the statement in paragraph 7 that "[t]he

---

[96] *See also Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 135 n.9 (4th Cir. 2002) (allowing affidavits that "contain sufficient information, including a description of the affiants' job titles and duties, to establish that the affiants' statements were made based on personal knowledge."); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (finding that affiants' "personal knowledge and competence to testify are reasonably inferred from their positions and the nature of their participation in the matters to which they swore").

Terms and Conditions have not changed since November 7, 2022" is less clear given that the Affidavit does not address her position or responsibilities prior to August 14, 2023.

More critically, the Court is unable to infer that she has personal knowledge as to either (a) her statement in paragraph 4 that T&C substantively identical to those submitted to the Court "accompanied" the OWF executed by EVBC, or (b) her statements in paragraphs 10 and 11 that EVBC "received and accepted" and "agreed to" such T&C.  The Affidavit simply provides no ground to conclude that the Electronic Banking – Wire Supervisor for a Pennsylvania-based bank with 350 branches, participated in an individual wire transfer at a local branch in North Carolina in a manner sufficient to the personal knowledge averred.[97]  In sum, FNB's reply and exhibit do not establish that critical averments of Ms. Reiser's Affidavit are based upon personal knowledge; hence if the Court were to convert FNB's motion to one seeking summary judgment at this time the Affidavit could not establish that the T&C submitted along with the OWF are incorporated therein.

### d.  The Notice Set Forth in the Terms and Conditions Submitted by FNB Does Not Meet the Requirements of Section 207(c)

Even if it were established that the T&C submitted by FNB were incorporated in an agreement between FNB and the Church with respect to the funds transfer at issue, dismissal of EVBC's section 207(c) claim would still be unwarranted, as the provision upon which FNB relies does not satisfy the statutory requirements under that section.  As set forth above, if EVBC proves

---

[97] *See Pack v. Hickey*, 776 F. App'x 549, 555 (10th Cir. 2019) ("[D]ecisions [have] found an inference of personal knowledge based not only on the corporate officers' respective positions, but *also* on 'the nature of their participation in the contested matters.'  Here . . . [the] affidavit was devoid of any indication that [the affiant] personally participated in [matters] such that the statements at issue . . . would be supported by personal knowledge, by inference or otherwise.") (citations omitted); *Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 1019–20 (E.D. Pa. 1997) ("Although personal knowledge can be inferred from the nature of the affiant's position under certain circumstances," where the affiant's status "standing alone, does not support the inference that he is also personally familiar with" the matters stated in the affidavit, the evidence "cannot be considered on a motion for summary judgment.").

each of the *prima facie* elements of its claim, the burden shifts to FNB to prove that before FNB accepted EVBC's payment order, EVBC had notice that payment "might be made **by the beneficiary's bank** on the basis of an identifying or bank account number even if it identifies a person different from the named beneficiary."   UCC §4A-207(c)(2) (emphasis added).   In an attempt to carry this burden, FNB proffers the following T&C provision:

> IDENTIFYING INFORMATION.   Sender acknowledges that in executing the Payment Order that Bank will use identifying account numbers of Beneficiary . . . rather than names [o]r titles of the account(s). Sender hereby agrees that Bank may make payment of a Payment Order on the basis of an identifying or account number despite the inconsistency of the name of the account holder and the Beneficiary.  . . . .

(Docket No. 39-1 at ¶ 7).[98]   FNB characterizes the foregoing passage as "clear notice to Plaintiff of **FNB's** intent to use the account number as identification for wire transfers, even if the name does not match the account."   (Docket No. 39 at 15) (emphasis added).[99]   In its opposing brief, EVBC points out that notice that FNB, the originator's bank, might pay based on the number does not meet section 207(c)'s requirement of notice that PNC, the beneficiary's bank, might pay based on the number.   (Docket No. 40 at 12-13). [100]

---

[98] The Court notes that the capitalized terms in the quoted passage – Sender, Payment Order, Bank and Beneficiary – are designated in the T&C as "DEFINED TERMS" which are to be "defined as set forth on the reverse side hereof". (Docket No. 39-1 at ¶ 14).   The Court further observes that the definitions (along with any other provisions on the reverse side) appear to be omitted from the version of the T&C submitted by FNB.  *Cf. Burch v. HSBC Bank*, No. 4:15-CV-00036-KGB, 2016 WL 1305918, at *3 (E.D. Ark. Mar. 31, 2016), quoting, *inter alia*, *N. Dakota State Univ. v. United States*, 255 F.3d 599, 607 (8th Cir. 2001) ("When written documents are relied on, they must be exhibited in full.").   Notwithstanding FNB's failure to include the definitions, the Court can readily discern that "Bank" refers to FNB (rather than, for example, PNC).  *See* Docket No. 39-1 at ¶ 4 (providing for communications to the Bank at "the following address . . . : FIRST NATIONAL BANK OF PENNSYLVANIA, Attention: Funds Transfer Department, 4140 East State Street, Hermitage, Pennsylvania, 16148").

[99] *See also* Docket No. 43 at 12 ("[T]he Terms and Conditions gave Plaintiff notice that **FNB** would rely on the account number when processing the wire transfer, even if there is an inconsistency between the account name and the identifying account number.") (emphasis added).   Thus FNB effectively concedes that the T&C's notice provision refers to itself.

[100] Because the Court finds the language of paragraph 7 of the T&C unambiguous, it is unnecessary to address Plaintiff's arguments that the provision is a contract of adhesion or an exculpatory clause.   (Docket No. 40 at 10-11).

FNB accurately distills the Church's position (Docket No. 43 at 11), and presents three arguments in reply:  First, it objects that "Plaintiff has not cited any case law to support its interpretation of the statute because no such cases exist",  while conceding that "there are very few reported cases interpreting the language of Section [4A-207(c)(2)]".  (*Id.*).  *See also ArubaWater Corp. v. Wells Fargo Bank, N.A.*, 703 F. Supp. 3d 995, 1004 (D. Ariz. 2023) ("case law surrounding [section 4A-207(c)] is extremely sparse").  Nevertheless, this Court finds there are at least two reported cases that analyze section 4A-207(c) as requiring notice that the *beneficiary's* bank might pay based on the account number alone.  *See Valley Chili Properties, LLC v. Truist Bank*, No. EP-23-CV-420-KC, 2024 WL 3509483, at *4 (W.D. Tex. June 27, 2024) (finding originator's bank not liable under section 4A-207(c) because "Plaintiff does not allege that [the originator's bank] provided inadequate notice regarding [the beneficiary's bank's] right to rely solely on the account number when accepting the funds transfer"); *Berry v. Regions Fin. Corp.*, 507 F. Supp. 3d 972, 980 (W.D. Tenn. 2020) ("Plaintiffs had notice that the beneficiary's bank might rely on an identifying number in making payment pursuant to the payment order even if the number identifies a person different from the named beneficiary", based on a Wire Request form reciting that "if the identifying number or bank account number Customer has given in this request is not the named beneficiary's, the beneficiary's bank may pay this funds transfer according to the number rather than according to the beneficiary's name.").

Second, FNB contends that *ArubaWater* "is directly on point and undermines Plaintiff's argument."  (Docket No. 43 at 11).  In *ArubaWater*, the originator of a diverted wire transfer sued the originator's bank, claiming said bank failed to give it the notice required under UCC § 4A-207(c).  After quoting the Code, the court "walked through" its steps, noting the parties' agreement

that the originator is not a bank and that the account holder was not entitled to the payment, and

fixing their disagreement as:

> whether Plaintiff had notice that Defendant might exclusively rely on the account number regardless of whether it matched the name associated with the account. Defendant claims that Plaintiff had notice through the Account Holder Services Agreement . . . . . [which] states "If an instruction or order to transfer funds describes the party to receive payment inconsistently by name and account number, we'll rely on the beneficiary account number even if the account number identifies a party different from the named recipient ... [y]ou could lose funds if you provide incomplete or inaccurate information in your payment orders." This is clear notice of Defendant's intent to use the account number as identification for wire transfers, even if the name does not match the account. Therefore, Defendant has met their burden under § [4A-207(c)].

*ArubaWater*, 703 F. Supp. 3d at 1004.  As this passage makes clear, the parties and the court

addressed only whether Plaintiff had notice that Defendant – the originator's bank – "might

exclusively rely on the account number".[101]  Because the significance of varying the actor in the

notice from the statutory specification of the beneficiary's bank was not before the court, its

opinion does not provide persuasive authority for the proposition that notice of what the

originator's bank might do suffices under § 207(c).  *See Webster v. Fall*, 266 U.S. 507, 511 (1925)

("The most that can be said is that the point was in the cases if any one had seen fit to raise

it.  Questions which merely lurk in the record, neither brought to the attention of the court nor

ruled upon, are not to be considered as having been so decided as to constitute precedents.").

Third, FNB protests that it "has no control over PNC – so it defies logic that [section 4A-

207(c)(2) could ever be interpreted to impose a requirement on FNB to notify Plaintiff what PNC

may or may not do." (Docket No. 43 at 12).  This Court finds, to the contrary, that there is a sound

logic behind both the Code's adoption of "precise and detailed rules" to enable the parties to

---

[101] The Court observes that the notice reads "we'll" rely on the account number, without specifying whether the plural "we" refers to the originator's bank or perhaps to all banks in the chain of payment collectively (including the beneficiary's bank).

"predict risk with certainty", UCC § 4A-102 cmt., and section 207(c)'s specific focus on notice of how the beneficiary's bank may process the funds transfer.  As the Church duly observes, only the beneficiary's bank typically possesses "the detailed account information . . . such as the account holder's name, and address" needed to match the account number to the beneficiary's name; and consequently, the originator's bank and any intermediary banks must of necessity rely on the account number alone.[102]  Moreover, the official commentary to section 207 explains why it is logical to require the originator's bank to provide notice about a beneficiary's bank over which it has no control:

> [The originator], however, may not have been aware of the risk involved in giving both name and number. Subsection (c) is designed to protect the originator, . . . . Under that subsection, the originator is responsible for the inconsistent description of the beneficiary if it had notice that the order might be paid by the beneficiary's bank on the basis of the number. If the originator is a bank, the originator always has that responsibility. The rationale is that any bank should know how payment orders are processed and paid. If the originator is not a bank, the originator's bank must prove that its customer, the originator, had notice.

UCC § 4A-207 cmt. 3.  In accordance with the foregoing comment, a bank such as FNB is expected to know that most payment orders are processed and paid by the beneficiary's bank based solely on the account number.[103]  Because a customer such as the Church is not charged with a similar degree of familiarity with banking industry practices, FNB is responsible to ensure that its customer, the Church, receives notice of this source of risk before it commits its funds to a wire transfer.  The Court finds the imposition of such a safeguard eminently logical.

---

[102] Due to this information disparity, the beneficiary's bank may be considered the "least cost avoider", best positioned to guard against incipient wire transfer fraud.  *See* n.133, *infra*.

[103] *Cf.* UCC § 4A-207 cmt. 2 ("A very large percentage of payment orders issued to the beneficiary's bank by another bank are processed by automated means . . . that identify the beneficiary by an identifying number or the number of a bank account.  . . . .").

Finally, apart from specific shortcomings discussed above, any argument FNB may raise in support of its contention that the notice in paragraph 7 of the T&C satisfied section 207(c) must give way before section 207(c)'s express and unambiguous requirement of notice that payment might be made by **_the beneficiary's bank_** – not the originator's bank – based solely on the account number. Under core principles of statutory construction, this Court is required to give effect to the plain terms of the Code. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."); *Gavin v. Loeffelbein*, 651 Pa. 465, 485, 205 A.3d 1209, 1221 (2019) ("[W]e are to give effect to the plain language of a provision whenever that language is clear and free from ambiguity.").[104] Accordingly, the Court finds that Plaintiff has sufficiently stated a claim under section 4A-207(c) of the UCC; and that consideration of the Affidavit of Ms. Reiser or of paragraph 7 of the T&C (*e.g.*, pursuant to Fed. R. Civ. P. 12(d)) would not establish a defense to said claim.

### C.   Plaintiff States a Claim for Negligence Under Pennsylvania Common Law Against PNC But Not Against FNB (Counts II and IV)

Count II asserts a claim for negligence against PNC based on PNC's breaches of common law duties of care owed in connection with the opening and administration of the Account and the subsequent withdrawals of funds therefrom.[105] The Church specifically alleges that PNC breached its duties by failing to comply with its own internal policies and with Federal "Know Your Customer" ("KYC") regulations, and by knowingly permitting withdrawal of fraudulently obtained funds from the Account. (Docket No. 28 at 7-10). Count IV asserts a claim for

---

[104] *See also Mohamed v. Com., Dep't of Transp., Bureau of Motor Vehicles*, 40 A.3d 1186, 1194 (Pa. 2012) ("When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.") (citation omitted); *In re Barshak*, 106 F.3d 501, 506 (3d Cir. 1997) ("We are not free to ignore the clear language of a Pennsylvania statute merely because by rewriting the statute we arguably would act consistently with a legislative policy.").

[105] *Cf.* n.115, *infra* (interpreting SAC as forgoing common law negligence claims based on funds transfer itself).

negligence against FNB based on failure to verify that "the identity of the beneficiary account name was the same as that in the wire instructions". (Docket No. 28 at ¶ 94). In moving to dismiss Count II, PNC argues that (i) EVBC's common law negligence claim is preempted by the UCC and (ii) banks do not owe any duty of care to noncustomers. (Docket No. 34 at 10-14). In moving to dismiss Count IV, FNB also argues that EVBC's common law negligence claim is preempted by the UCC. (Docket No. 39 at 11-13). As explained below, the Court finds these arguments insufficient to warrant dismissal of Count II but sufficient to warrant dismissal of Count IV.

### 1. The UCC Preempts Common Law Claims to the Extent Predicated on Banks' Conduct in the Course of a Funds Transfer

The Comments to Article 4A provide in relevant part:

> The rules [set forth in Article 4A to govern "funds transfers"] . . . are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

UCC § 4A-102, cmt. As PNC correctly observes, a "funds transfer" governed by Article 4A "is defined as the series of transactions that begins with the originator's payment order and [is] completed by acceptance by the beneficiary's bank of a payment order." (Docket No. 34 at 10) (citing 13 Pa. C. S. § 4A104(a)).

This Court agrees with the preemption analysis set forth in *Fragale v. Wells Fargo Bank, N.A.,* 480 F. Supp. 3d 653 (E.D. Pa. 2020), a case relied upon by both the Church and PNC. In *Fragale*, the Court determined the scope of Article 4A by parsing the definitions of "payment order" and "funds transfer" in 13 Pa. C.S. §§ 4A-103, 4A-104, and found that "[b]y definition, Article 4A governs only those actions occurring between the originator's wire fund instruction . . . and the beneficiary bank's acceptance of the wire transferred funds." *Fragale*, 480 F. Supp. 3d at 659. The *Fragale* court thus concluded that claims premised on the opening of the account (which

occurred before the payment order was issued) or on the withdrawal of funds from the account (which occurred after the funds were accepted) fall outside the scope of Article 4A and are not preempted.[106]  *Id.*  This Court concurs.

The UCC in general, and Article 4A in particular, contemplate only conflict preemption, not field preemption.[107]  As the Court of Appeals for the Third Circuit has explained:

> [T]he UCC does not purport to preempt the entire body of law affecting the rights and obligations of parties to a commercial transaction. Section 1-103 provides that general principles of law remain applicable unless otherwise preempted by the Code:
>
> > Unless displaced by the particular provisions of this Act, the principles of law and equity . . . shall supplement its provisions.
>
> As a general rule, courts have read these . . . principles of construction to mean that the UCC does not displace the common law of tort as it affects parties in their commercial dealings except insofar as reliance on the common law would thwart the purposes of the Code.

*New Jersey Bank, N. A. v. Bradford Securities Operations, Inc.*, 690 F.2d 339, 345-46 (3d Cir. 1982) (footnote omitted).[108]  Accordingly, the Comment to Article 4A contemplates

---

[106] PNC asserts that "*Fragale* is widely recognized as limited to its facts and does not support bringing a negligence claim where the heart of the complaint is a wire transfer."  (Docket No. 34 at 7 n.2).  However, the only authority provided by PNC is a case under UCC Article 3 which involves fraudulent checks and has nothing to say about what claims may be brought in cases involving wire transfers.  (*Id.*).  *See H.G. Litig. Grp. v. TD Bank*, 598 F. Supp. 3d 249, 253 & n.1 (E.D. Pa. 2022).

Moreover, the Court disagrees with PNC's characterization that the "heart of the complaint" herein is a wire transfer.  To the contrary, while a wire transfer is at the heart of Count I, PNC's alleged lax account management lies at the heart of Count II. *Compare Attisha Enters., Inc. v. Cap. One, N.A.,* 505 F. Supp. 3d 1051, 1058 (S.D. Cal. 2020) (because "allegedly negligent release of . . . funds . . . .  directly involves a funds transfer, the claim must arise under [UCC § 4A-207], not common law negligence"), *with Approved Mortg.*, 106 F.4th at 592 ("We cannot accept this 'direct result' reasoning.").

[107] *See generally Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990) (explaining categories of express, field and conflict preemption).

[108] *Cf. Regions Bank*, 345 F.3d at 1274–75, quoting White & Summers, Uniform Commercial Code, §§ 1-2, at 132 (1993 pocket part) ("With the adoption of Article 4A, electronic funds transactions are governed not only by Article 4A, but also common law . . . ."); *id.*, quoting T.C. Baxter & R. Bhala, "The Interrelationship of Article 4A with Other Law," 45 Business Lawyer 1485, 1485 (1990) ("[T]he Drafting Committee intended that Article 4A would be supplemented, enhanced, and in some places, superceded [sic] by other bodies of law . . . the Article is intended to synergize with other legal doctrines.").  *See also Simple Helix*, 493 F. Supp. 3d at 1105 (holding that Article 4A is not the exclusive means of redress: "plaintiff may assert a common law claim based upon a funds transfer if the claim (1) arises from circumstances not contemplated in Article 4A or (2) represents rights and obligations not contrary to those set forth" therein) (collecting cases).

displacement only of "rights, duties and liabilities inconsistent with those stated in this

Article."[109]

As the Court of Appeals for the Seventh Circuit recently elaborated,

'Article 4A embodies an intent to restrain common law claims only to the extent that they create rights, duties, and liabilities *inconsistent* with Article 4A.' *Patco Constr. Co. v. People's United Bank*, 684 F.3d 197, 215 (1st Cir. 2012). A common law claim is not 'per se inconsistent with [Article 4A's] regime' merely because the alleged facts include a wire transfer. *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010); *see Regions Bank* . . . 345 F.3d [at] 1274–75 . . . . A court must determine whether Article 4A's 'provisions protect against the type of underlying injury or misconduct alleged in a claim.' *Ma*, 597 F.3d at 89–90. If Article 4A 'does not protect against the underlying injury or misconduct alleged,' then a common law claim is not preempted. *Patco Constr. Co.*, 684 F.3d at 215–16.

*Approved Mortg.*, 106 F.4th at 592–93. In brief, "[w]hen the alleged acts or omissions forming

the basis for a common law claim are outside the scope of Article [4A], the claim is not

preempted." *Id.* at 93.

### 2. Plaintiff's Common Law Negligence Claim Against PNC Is Not Preempted, Except Insofar as it Is Predicated on PNC's Processing of the Wire Transfer

PNC contends that "Article 4A of the UCC . . . is the sole vehicle under which to bring any

claim regarding a wire transfer", and that because "a funds transfer is at issue in Plaintiff's

---

[109] *See Sheerbonnet, Ltd. v. Am. Exp. Bank, Ltd.,* 951 F. Supp. 403, 408 (S.D.N.Y. 1995), *as amended* (May 1, 1996) ("Commentators uniformly recognize that Article 4-A is not a hermetic legal seal over funds transfers."); *id.* (observing that "where the provisions do not venture, the claimant need not turn back; he or she may seek other guides, statutory or judicial. The only restraint on . . . such relief is that 'resort to principles of law or equity outside of Article 4A' must not be inconsistent with [its] provisions"). *See also id.* at 408 ("The Article itself is replete with references to common law remedies. Many sections borrow freely from the tort concepts of 'ordinary care,' 'reasonableness,' and 'the law governing mistake and restitution.'").

This Court recognizes that the official commentary to the revised UCC criticized *Sheerbonnet* as applying "other law in situations in which that application, while not inconsistent with the text of any particular provision of the Uniform Commercial Code, clearly was inconsistent with the underlying purposes and policies reflected in the relevant provisions of the Code." UCC § 1-103 cmt. 2. *But see Koss Corp. v. Am. Exp. Co.*, 309 P.3d 898, 907 n.11 (Ariz. Ct. App. 2013) (disagreeing with UCC comment's reading of *Sheerbonnet* and noting that "one of the most respected commentators on the U.C.C. has concluded that *Sheerbonnet* . . . [was] properly decided because . . . U.C.C. preemption should not apply to cases where the defendant was alleged to have acted fraudulently") (citing White & Summers, *supra*).

Complaint", any "separate common law claim for negligence is . . . preempted as a matter of law." (Docket No. 34 at 11).[110]  However, the *Approved Mortg.* opinion explicitly rejected a similar contention that a claim was preempted merely because the harm therein was "in reality a direct result" of the defendant bank's acceptance and payment of wire transfers.  *Approved Mortg.*, 106 F.4th at 592-93 (reasoning that a "common law claim is not per se inconsistent with Article 4A's regime merely because the alleged facts include a wire transfer") (brackets and internal quotation marks omitted).

PNC further asserts that a "mountain of caselaw . . . supports preemption of [EVBC's] negligence claim", provides four cases in support of that assertion,[111] and concludes, without more, that allowing Count II to proceed would "thwart the purposes of the UCC's comprehensive and exclusive statutory scheme for Plaintiff's purported injuries." (Docket No. 34 at 11-12).  However, the Court finds that the weight of authority holds that there is no preemption with respect to banks' assertedly negligent conduct that pre-dates or post-dates a funds transfer.[112]

---

[110] By claiming that all common law claims are preempted merely because a wire transfer is "at issue", PNC is effectively advocating for field preemption.  *Cf.* n.107, *supra*, and accompanying text.

[111] Some of the decisions relied upon by PNC appear to be justified primarily on grounds other than preemption.  *See e.g., Eburuoh v. PNC Bank, N.A.*, 2002 WL 2176305 (E.D. Pa. June 16, 2022) (dismissing *pro se* plaintiff's claims - for equitable relief, breach of contract, conversion, replevin, promissory estoppel and under Pennsylvania Unfair Trade Practices and Consumer and Protection Law - on grounds of inapplicability of equitable relief, statute of limitations/time bar and gist of the action doctrine, where plaintiff brought claims five years after PNC withheld wire transfers into plaintiff's PNC account pending inquiry and then returned transfer funds to sender); *id.* at *6 (stating, after finding equitable relief inappropriate when other adequate remedies are available, that "[f]urther, . . . Article 4A . . . preempts equitable principles inconsistent with its provisions, purposes or policies as well as parallel equitable claims when it provides a 'comprehensive' remedy" and "[i]n fact, preempts Eburuoh's claim") (citing, for purposes of negligence preemption, *REAmerica, S.A. v. Wells Fargo Bank Int'l*, No. 04-5233, 2008 WL 7811571, at *7 (S.D.N.Y. Mar. 18, 2008), *aff'd*, 577 F.3d 102 (2d Cir. 2009)).  The Court notes that the *REAmerica* decision held that Article 4 preempted a common law negligence claim where raising said claim two years after the date of alleged injury would create a right wholly inconsistent with the one year statute of repose imposed by UCC § 4A-505.

[112] For cases finding no preemption of both pre- and post-transfer claims, s*ee, e.g., Fragale*, 480 F. Supp. 3d at 660 (claims premised on opening account and subsequent withdrawal of transferred funds not preempted); *Squeeze Me Once,* 2020 WL 12968001 at *9 (Article 4A preempts only claims that "specifically arise out of the transfer of funds"; finding account opening and fund withdrawal claims not preempted).

For cases finding no preemption of pre-transfer claims, s*ee, e.g., Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 224 (4th Cir. 2002) (negligence claims not preempted "insofar as they challenge the opening and management of [the] account"); *Nirav Ingredients, Inc. v. Wells Fargo Bank, N.A.*, 516 F. Supp. 3d 535, 540 (W.D.N.C. 2021), aff'd, No.

The Court cannot see how recognition of common law duties to, for example, verify account holders' identities, or follow-up on suspicious account activities, or freeze accounts with fraudulently obtained funds,[113] could conflict with any right or duty under Article 4A, or would otherwise "thwart the purposes" of the Code.  As the court observed in *Approved Mortg.*,

> to the extent [a] claim is based on . . . [the bank's] issuance of cashier's checks. . .,
> the claim is not preempted . . . . [because it] resulted from activity beyond the
> scope of Article [4A].  The negligent withdrawal claim does not arise from the
> wire transfers themselves but from [the bank's] conduct after crediting the
> transferred funds . . . .  It exacerbates the earlier transfer injury by making the
> repayment contemplated by Article [4A] more difficult and, indeed, unsure.

*Approved Mortg.*, 106 F.4th at 594.[114]  Accordingly, EVBC's claims against PNC are not

---

21-1893, 2022 WL 3334626 (4th Cir. Aug. 12, 2022) (allowing common law claims predicated on "conduct relating to the opening and maintaining of a fraudulent account") (following *Eisenberg*); *DeFazio v. Wells Fargo Bank Nat'l Ass'n*, No. CV 20-375 (SRC), 2020 WL 1888252, at *4 (D.N.J. Apr. 16, 2020) (claim for lack of care in opening and management of accounts not barred by Article 4A); *Remtek Servs., Inc. v. Wells Fargo Bank, N.A.*, No. CV1912790RBKKMW, 2020 WL 241332, at *4 (D.N.J. Jan. 16, 2020) ("claims alleging negligence in the opening of an account that are not inconsistent with Article 4A may go forward"); *Attisha*, 505 F. Supp. 3d at 1056 (claim for negligence in opening account not preempted); *Anderson v. Branch Bank & Trust Co.*, 119 F.Supp.3d 1328, 1358 (S.D. Fla., 2015) (same); *Gilson v. TD Bank, N.A.*, 73 U.C.C. Rep.Serv.2d 430, 2011 WL 294447, at *9 (S.D. Fla. Jan. 27, 2011) (same).

For cases finding no preemption of post-transfer claims, s*ee, e.g.*, *Approved Mortg.*, 106 F.4th at 592-95 (claims for permitting post-transfer withdrawals not preempted); *Schlegel v. Bank of Am., N.A.*, 271 Va. 542, 553-555, 628 S.E.2d 362, 368 (2006) (claims related to freezing of transferred funds not preempted); *Shooter Pops LLC v. Wells Fargo Bank, N.A.*, 649 F. Supp. 3d 62, 66 (E.D. Pa. 2023) (claim of negligence premised on withdrawal of funds occurred after wire transaction was complete and is not preempted by Article 4A); *Chemalloy*, 609 F. Supp. 3d at 375 (same); *3T Oil & Gas Servs., LLC v. JPMorgan Chase Bank, N.A.*, No. A-18-CV-131-LY, 2018 WL 5018483, at *3 (W.D. Tex. Oct. 16, 2018), report and recommendation adopted, 2018 WL 6220139 (W.D. Tex. Nov. 1, 2018) (claim based on representations made by bank after wire transfer was completed not preempted); *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, No. 19-CV-02778-TSH, 2019 WL 3503109, at *3-4 (N.D. Cal. Aug. 1, 2019) (claims for post-transfer conduct not preempted); *Koss*, 309 P.3d at 906 (no preemption of claim based on conduct "that did not occur during the process of wire transfers, but after the transfers were complete").

[113] In particular, the Code clearly anticipates that "applicable law" (meaning common law) will govern conditions under which transferred funds may be withdrawn from an account.  *See* UCC § 4A-503 ("For proper cause and in compliance with applicable law, a court may restrain . . . the beneficiary's bank from releasing funds to the beneficiary.").

[114] The *Approved Mortg.* opinion's treatment of pre-transfer claims is somewhat less clear than its express approval of post-transfer withdrawal claims.  The opinion suggests (parenthetically) that "pre-transfer diligence" may be included within the "responsibilities of a beneficiary's bank with respect to a funds transfer" that Article 4A "may seek to govern".  *Approved Mortg.*, 106 F.4th at 595.  This Court reads that suggestion as limited to diligence "with respect to a funds transfer" – that is, to diligence in preparing forms or adopting procedures to be used in a particular funds transfer.  To interpret it otherwise would be in tension with *Approved Mortg.*'s questioning of why conduct "should be treated as within the scope of Article [4A] despite [the] lack of rules governing such conduct".  *Id.*  *See also id.* at 594 (positing claim based on duty to "include precautionary measures to prevent misapplied transfers" as exemplar of

preempted except to the extent they are predicated on PNC's conduct in processing the wire transfer itself.[115]

### 3. Plaintiff's Common Law Negligence Claim Against FNB Is Preempted

EVBC's common law negligence claim against FNB (Count IV) stands on a different footing.  The SAC's principal allegation in support of this claim is that FNB breached a duty to EVBC to "verify that wire transfers are sent only in compliance with instructions contained in the wire transfer or to provide reasonable systems of verification to ensure transfers from customer's accounts reach only the intended, named beneficiary."  (*Id.* at ¶ 91).  Because this claim appears to be expressly predicated on FNB's conduct with respect to wire transfers, it is unambiguously preempted by the provisions of Article 4A.  The Church argues that its common law claims against FNB are not preempted because they "encompass time periods before the funds transfer", and in support proffers two pre-transfer acts by FNB: maintaining a process which does not validate that "the beneficiary named is the actual beneficiary of the account" and misleadingly asking for the beneficiary's name for the wire order.  (*Id.*).  As to the first, EVBC has no cause to complain about FNB's maintenance of faulty processes in general; it is only the application of such a process to EVBC's transaction that could have injured it, and any such application necessarily occurred during the course of the funds transfer.  As to the second, it seems clear that soliciting information during the preparation of a wire transfer payment order is part of the transaction embodied by such order, and hence part of the series of transactions comprising the funds transfer.  *Cf. Approved*

---

"lack of diligence" claim governed by Article 4A).

[115] Among its allegations concerning the opening of the account, EVBC states that by "transferring the money to an account opened without adhering to KYC and internal policies, PNC proximately caused EVBC to be damaged in an amount of not less than $ 775,937.10."  (Docket No. 28 at ¶ 70).  The Court reads this as an allegation of damages stemming from PNC's alleged breaches of duty in opening the account, rather than as an allegation that PNC was negligent in transferring the funds to the account.  To the extent that ¶ 70 may be interpreted as asserting a common law claim against PNC for breach of duty in transferring the funds, the Court finds that such a claim would be preempted in accordance with the principles set forth *supra*.

*Mortg.*, 106 F.4th at 595 (suggesting Article 4A may govern bank's "pre-transfer diligence" as part of its responsibilities with respect to a funds transfer).[116]

### 4. PNC Owed a Duty of Care to Plaintiff Under Pennsylvania Law

Reading the factual allegations of the SAC, with reasonable inferences therefrom and in the light most favorable to Plaintiff, the Court finds that the Church has plausibly supported a conclusion that by opening a bank account for an unidentified holder, and dispensing with safeguards required by its own procedures and by federal regulation such as KYC, PNC engaged in affirmative conduct that foreseeably increased the risk that a person in EVBC's position would be victimized by fraud.[117]  The Pennsylvania Supreme Court has long and consistently recognized a common law duty owed to potential victims arising from such increased risk.

> In scenarios involving an actor's affirmative conduct, he is generally 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.' Restatement (Second) of Torts § 302, cmt. a (1965); see also [W. Jonathan] Cardi & [Michael D.] Green, *Duty Wars*, 81 S. Cal. L.Rev. [671,] 716 [(2008)] (describing the proposition that a defendant owes a duty of care not to act in a way that creates a risk of harm for others as 'black letter law repeated by an overwhelming majority of courts').  This duty appropriately undergirds the vast expanse of tort claims in which a defendant's affirmative, risk-causing conduct is in issue.

*Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1246 (Pa. 2012).  *See also Dittman v. UPMC, 196 A.3d 1036, 1046-47 (Pa. 2018)* (quoting *Seebold*); *Suchomajcz v. Hummel Chem. Co., Newark, New Jersey*, 524 F.2d 19, 24 (3d Cir. 1975) (Rosenn, J.) ("each person bears

---

[116] *See* n.114, *supra*.

[117] A would-be cybercriminal, intending to divert funds in the banking system, requires a bank account that he can control without revealing his true identity.  Under the KYC regulations, such an account should be difficult to obtain. It stands to reason, then, that by providing the cybercriminal with such an account by opening it without appropriate scrutiny, PNC has furnished him with an essential tool of his enterprise, thereby increasing the risk of harm to innocent users of the banking system.  *Cf. Anderson v. Bushong Pontiac Co.*, 171 A.2d 771, 773 (Pa. 1961) (quoting Restatement of Torts § 308 (1934)) ("It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.").

[responsibility] to exercise care in his conduct to avoid unreasonable risk of harm to another")

(citing Restatement (Second) of Torts § 302, cmt. a (1965)).[118]

And the Court has explained the source of this duty in broad terms:

> The duty defendant breached was a duty imposed by law, not a duty self-imposed by contract.  It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others.  This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable.

*Prost*, 187 A.2d at 276, quoting *Bisson v. Kelly, Inc.*, 170 A. 139, 143 (1934) (italics in *Bisson*).

*See also Brown*, 294 A.3d at 434 (describing foregoing rule as a "bedrock legal principle and

policy").

The breadth of this common law duty[119] is incompatible with a rule limiting its application

to those with a pre-existing relationship to the actor, such as a bank's customers.[120]  As the Court

explained just last year,

> [O]ur seminal case in *Prost* . . . . . emphasiz[ed] that a party to a contract has a broader duty to all individuals who are not parties thereto – namely, that he perform his 'contractual undertaking[s] in such manner that third persons — strangers to the contract — will not be injured thereby.'

*Brown*, 294 A.3d at 422.

---

[118] This duty is so well established that many judicial opinions on negligence find it unnecessary to address the duty element, "because they presume the existence of a duty where the defendant's conduct created a risk." Cardi & Green, *Duty Wars*, 81 S. Cal. L. Rev. at 702, *quoted in Dittman*, 196 A.3d at 1047, *and in Seebold*, 57 A.3d at 1246 n.21.

[119] *Cf. Alderwoods (Pennsylvania), Inc. v. Duquesne Light Co.*, 630 Pa. 45, 66, 106 A.3d 27, 40-41 (2014) ("Common-law duties stated in general terms are framed in such fashion for the very reason that they have broad-scale application.").

[120] Indeed, recognizing such a limitation in a tort-based duty would be tantamount to reviving the privity requirement which has been abrogated in Pennsylvania.  *See* n.40, *supra*.  Moreover, limiting the duty specially for banks would amount to according the banks a species of immunity without fully weighing the policies at stake.  *Cf. Alderwoods*, 630 Pa. at 65, 106 A.3d at 40 (declining to relieve electric companies of the same tort duty, and explaining that "such matters of immunity generally are best decided by the political branch" and that "treatment of these sorts of policy arguments should be on a developed record").

Notwithstanding the general applicability of the foregoing duty under Pennsylvania law, PNC argues that it cannot be liable to EVBC because "[i]t is well settled law that 'banks do not owe **any** duty of care to noncustomers'".[121]  Docket No. 34 at 12, quoting *Chemalloy*, 609 F. Supp. 3d at 377 (emphasis supplied by PNC).   In support of this asserted principle, PNC and the *Chemalloy* opinion rely upon four additional cases.  Docket No. 34 at 13; *Chemalloy*, 609 F. Supp. 3d at 377.[122]  Upon review, however, the Court finds *Chemalloy* and three of the other cited cases to be readily distinguishable because they do not involve substantial affirmative risk-creating conduct.  *See Chemalloy*, 609 F. Supp. 3d at 377 (rejecting duty predicated on bank's "promise to intervene, later withdrawn");[123] *Adkins v. Sogliuzzo*, 625 F. App'x 565, 569 (3d Cir. 2015)

---

[121] PNC's assertion that a bank owes no duty to the true owner of funds in its possession, simply because the owner is not its customer, is incompatible with PNC's alleged conduct in remitting $17,939 back to EVBC.  (Docket No. 28 at ¶ 52).  Rather than suppose that PNC repaid the remaining funds to the Church from purely eleemosynary motives, it appears more reasonable to infer that the repayment reflected PNC's recognition of EVBC's right to the funds and of its corresponding duty to restore the remaining funds to their rightful owner.  *Cf. Brubaker v. Berks Cnty.*, 112 A.2d 620, 622 (Pa. 1955) ("where property is fraudulently converted and diverted from its proper use, the third person into whose hands the property falls without consideration, even though he be innocent of knowledge of any wrongdoing, has the obligation to restore to its rightful owner the property so wrongfully appropriated") (citing Illustration 5 to Restatement (First) of Restitution § 128 (1937)).

[122] In its Reply, PNC adds one more "no duty" case, *Shooter Pops*, 649 F. Supp. 3d at 70.  (Docket No. 37 at 9).  However, as most of the opinion in *Shooter Pops* is drawn nearly verbatim from the opinion in *Chemalloy*, it does not alter the Court's analysis.

[123] There is no suggestion in *Chemalloy*'s factual recitation that the bank therein had violated regulations, policies or norms in opening or administering the fraudster's account.  The *Chemalloy* court consequently had no occasion to address whether a bank might owe a duty to protect a noncustomer from a realized financial peril which the bank's own antecedent negligence helped to create.  *Cf. Chemalloy*, 609 F. Supp. 3d at 377 (observing that "mere knowledge of a dangerous situation, even by one who has the ability to intervene is not sufficient to create a duty to act") (citation and bracketed capitalization omitted).

*Chemalloy* (along with its companion case, *Shooter Pops*; *see* n.122, *supra*) also held that a bank is not required to take action to freeze an account after being notified of potential fraud, absent a court order or indemnity bond pursuant to section 606 of the Pennsylvania Banking Code, 7 P.S. § 606 (governing when a bank is required to "recognize an adverse claim to . . . a deposit account").  *See Shooter Pops*, 649 F. Supp. 3d at 66-68; *Chemalloy*, 609 F. Supp. 3d at 375-76.  *See also Zhejiang*, 2024 WL 1096534 at *3 (following *Shooter Pops* and *Chemalloy*).  However, *Shooter Pops* and *Chemalloy* acknowledge that § 606 does not preclude a bank from freezing an account without a court order to protect a third party fraud victim if it chooses to do so.  *See Shooter Pops*, 649 F. Supp. 3d at 67-68 (indicating that bank "elected to safeguard most of the remaining funds for the noncustomer's benefit"); *Chemalloy*, 609 F. Supp. 3d at 376 indicating that bank "elected not to exercise that option").  Neither *Chemalloy* nor *Shooter Pops*, nor the text of § 606, suggests that the statute absolves the bank of any duty it may otherwise have to make this choice in favor of protecting a party whose funds have been placed in jeopardy due in part to the bank's own antecedent negligence.  In any event, even if § 606 were to be interpreted as precluding a claim based on PNC's failure to freeze the subject account without a court order, a jury could well find that, as soon after the funds transfer as PNC should have known

(requiring "some definite relation between the parties" in "actions based on nonfeasance"); *Eisenberg*, 301 F.3d at 226 n.2 (finding that "opening a bank account under a 'dba' name is not in itself suspicious enough to give rise to a duty of inquiry" under North Carolina law);[124] *Commerce Bank/Pennsylvania v. First Union National Bank*, 911 A.2d 133, 139 (Pa. Super. 2006) (finding no duty where risk was "vague and attenuated", and plaintiff failed to explain how harm was foreseeable).

The final case relied upon by PNC, *Fragale*, *supra*, requires somewhat more discussion. The plaintiffs in *Fragale* did seek to predicate a duty on the bank's risk-creating conduct,[125] but the court rejected their claims. In so doing, the court distinguished *Dittman*, principally on the ground that *Dittman* "involved a relationship and the duties owed by an employer to its employees," whereas there is "no relationship (contractual or otherwise)" between a bank and a noncustomer. *Fragale*, 480 F. Supp. 3d at 662. This Court must respectfully adhere to an alternate reading of *Dittman*. Although the defendant hospital system in *Dittman* was indeed the employer of the plaintiff class, the opinion's imposition of a duty was not predicated on that relationship, but on the hospital's affirmative, risk-creating conduct. *See Dittman*, 196 A.3d at 1046 (finding that "the common law duty at issue here" is the duty to exercise reasonable care to protect others against a risk of harm arising out of an actor's affirmative conduct); *id.* at 1047 ("Employees have sufficiently alleged that UPMC's affirmative conduct created the risk of a data breach. . . . [W]e

---

[124] *Compare Attisha*, 505 F. Supp. 3d at 1056 (duty to investigate potentially phony account may arise if circumstances surrounding account opening are sufficiently suspicious).

[125] The plaintiff in *Fragale* argued that the bank subjected him to an unreasonable risk of harm when it "improperly opened a fraudulent account that facilitated a cyber-crime" and failed to monitor subsequent transactions for fraudulent activity. *Fragale*, 480 F. Supp. 3d at 662.

agree . . . that, in collecting and storing Employees' data on its computer systems, UPMC owed Employees a duty to exercise reasonable care to protect them against an unreasonable risk of harm arising out of that act."). [126]  *Cf. In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 528 (M.D. Pa. 2021) (concluding that "the majority opinion [in *Dittman*] in fact relied primarily on UPMC's affirmative conduct, and not solely the parties' employment relationship").[127]

Finally, the *Fragale* court also distinguished *Anderson*[128] on the ground that the risk of an incompetent teen driver stealing a car and injuring a pedestrian in *Anderson* was far more foreseeable than the risk of an imposter using a bank account to divert wired funds at issue in *Fragale*.  In this regard, the *Fragale* court observed that:

> At most, Plaintiff has alleged that banks like Wells Fargo were generally on notice that such schemes exist.  However, Plaintiff does not allege **any** facts to suggest that when Wells Fargo actually opened the Account, it should have been on notice that this particular account was being opened for criminal or fraudulent purposes.

*Fragale*, 480 F. Supp. 3d at 664 (emphasis in original).   This absence of facts showing foreseeability of risk in *Fragale* distinguishes that case from the one *sub judice*.  Here, the Church has plausibly alleged circumstances suggesting that irregularities in the particular account at issue marked it as suspicious, and therefore risky, from the start.  The Court therefore must differ from

---

[126] The *Fragale* court also distinguished *Dittman* on the ground that the bank in *Fragale* neither required the plaintiff to submit personal information, nor stored any such information.  480 F. Supp. 3d at 662.  But such details may be peripheral to the question of whether the bank's conduct subjected the plaintiff to risk, and to the considerations which formed the basis of the Pennsylvania Supreme Court's decision.

[127] In *Rutter's*, the court indicated that where "there is no pre-existing 'special relationship' . . . , a defendant's affirmative conduct can nonetheless be the origin of such a special relationship—in other words, affirmative conduct associated with an increased risk of harm can yield a special relationship for tort purposes.  *Rutter's*, 511 F. Supp. 3d at 529.  See also *Walters v. UPMC Presbyterian Shadyside*, 646 Pa. 746, 775-76, 187 A.3d 214, 232 (2018) (under "our time-honored general rule . . . . 'each person may be said to have a relationship with the world at large that creates a duty to act where his own conduct places others in peril'") (quoting *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 523 Pa. 1, 8 (Pa. 1989)).  *Cf. Dahlstrom v. Shrum*, 368 Pa. 423, 425 (Pa. 1951) ("The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension.") (quoting *Palsgraf v. Long Is. R.R. Co.*, 248 NY 339, 34, 162 N.E. 99 (1928) (Cardozo, J.).

[128] *Anderson v. Bushong Pontiac Co., cited in* n.117, *supra*.

*Fragale* on the question of duty.[129]

Based on the foregoing authorities and analysis, this Court concludes that the Supreme Court of Pennsylvania would most likely hold that a bank owes a duty to users of the banking system, including noncustomers, to refrain from opening or administering accounts in an unreasonable manner which serves to create or increase the risk that such users of the banking system will be injured by cybercrime or other fraud. Accordingly, the Court finds that Plaintiff has stated a claim for negligence against PNC under the common law of Pennsylvania.[130]

## VII.   CONCLUSION

The Court is mindful of its obligations, when tasked with ascertaining legislative intent, to "first look to the language of the statute itself" - applying the intent revealed thereby if the language is clear and unambiguous - and to interpret the statute's language "in context, with every statutory section read together and in conjunction with the remaining statutory language, and construed with reference to the entire statute as a whole." *Tr. Under Agreement of Taylor*, 164 A.3d at 1155, 1157 (internal quotation marks and citation omitted). In keeping with these principles, the Court finds

---

[129] Because the plaintiff did not state a claim under the traditional common law theories articulated in *Dittman* or *Anderson*, the *Fragale* court proceeded to analyze whether a new duty should be recognized in accordance with the five-factor test propounded by the Pennsylvania Supreme Court in *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000). The court in *Chemalloy* undertook the same exercise, and both courts concluded that on balance the factors weigh against recognizing a duty. *See Fragale*, 480 F. Supp. 3d at 669; *Chemalloy*, 609 F. Supp. 3d at 379.

This Court would be inclined to weigh several of the factors differently (or would predict that the Pennsylvania Supreme Court would weigh such factors differently). However, because the Court finds that Plaintiff has, under the presently applicable standard, stated a claim for negligence predicated on a recognized duty, it need not embark on an analysis of the *Althaus* factors. *See, e.g., Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 13-14 (Pa. 2019) ("[A]n *Althaus* analysis was not necessary here because our review reveals the present circumstances involve application of existing statutory and common law duties of care"); *Alderwoods*, 106 A.3d at 40 ("It is not necessary to conduct a full-blown public policy assessment in every instance in which a longstanding duty imposed on members of the public at large arises in a novel factual scenario.").

[130] The Court notes that the SAC asserts that PNC's alleged violations of KYC regulations rendered it negligent per se. (Docket No. 28 at ¶ 69). *Cf.* n.11, *supra*. Negligence per se is not a separate claim under Pennsylvania law but is subsumed within Plaintiff's general negligence claim. Since the Court finds that Plaintiff has stated a claim predicated on a common law duty, it is unnecessary at this stage to determine whether Plaintiff's negligence per se claim (predicated on a statutory/regulatory duty) is also viable. And since the question would benefit from development of additional factual detail and further briefing, the Court declines to address it now.

that the Church has stated alternative refund claims against FNB under the plain terms of UCC section 4A-207 (governing liability) and section 4A-402 (governing "chain of payment") – either under section 207(b)(2) if PNC knew of the payment order misidentification or under section 207(c) if PNC did not know.  However, determining which alternative theory may prevail (and hence which bank, as between PNC and FNB, may ultimately bear the loss) presents a more complex problem of interpretation.  *See* Sections VI(B)(1) – (3), *supra*.

Over a quarter of a century ago, the drafters of Article 4A provided a "thoroughly considered" statute governing responsibility, behavioral norms, risk allocation and liability for a fledgling commerce in wire transfers, which was "a product of recent and developing technological changes."  UCC § 4A-102 cmt.  The rules that emerged represent a "careful and delicate balancing" of the competing interests of the banks, commercial and financial organizations that provide and utilize funds transfer services and the public.  *Id.*  Article 4A's provisions governing misdescription of a beneficiary reflect that balance - and the drafters' awareness of the dynamic nature of their subject - in their creation of clearly-drawn rules which are also explicitly predicated on a conception of organizational knowledge founded in traditional common law principles of agency law and reasonableness.[131]

Read in conjunction with section 1-202(f), section 4A-207 evinces the drafters' intent to encourage a socially optimal balance between the efficiency and certainty afforded by automated funds transfer processing, on one hand, and the utilization of available information to minimize foreseeable losses from wire transfer fraud, on the other.  The Code seeks to achieve such a balance by authorizing banks to identify funds transfer beneficiaries by account numbers alone when the

---

[131] *See* UCC § 4A-207(b) (determining beneficiary bank's responsibility based upon its knowledge); *id.* cmt. 2 (noting that organization's knowledge is determined under rules stated in § 1-202(f)); *id.* § 1-202(f) (charging organization with knowledge for particular transaction based on requirement of "reasonable routines for communicating significant information").

banks do not know of a misidentification, while at the same time charging them with knowledge of any information in their system that should be brought to bear on a particular transaction under a reasonable routine for communication of significant information.

Determination of whether a bank is charged with knowledge of a misidentification under the Code requires consideration of what information was received by the bank (system-wide) before or during the funds transfer, and what routines it had, or should have had, in place for dissemination of such information to its agents conducting the transaction. Ascertainment of what types of information a "reasonable" routine would convey (and when, and to whom) requires weighing the burdens of distributing and using such information against the expected benefits of its use – a process familiar to the courts in assessing reasonableness across many common law and statutory contexts.[132]

This Court believes that such a weighing of the burdens and benefits of information dissemination is inherently required in order to implement the carefully balanced framework contemplated by the Code. And for the reasons aforesaid, the Court finds it plausible that such a weighing will favor imputation to PNC of effective knowledge of the misidentification.[133]

---

[132] A similar weighing of burdens and benefits is applicable to assessment of a bank's asserted common law negligence in account administration before and after a wire transfer transaction, which is not governed by Article 4A.

[133] The Court is inclined to believe that once a wire transfer transaction has commenced, the beneficiary's bank is almost certain to be the "least-cost avoider" – that is, the party best positioned to prevent fraud loss through reasonable preventive measures. *See generally*, G. Calabresi, The Costs of Accidents (1970), *cited in Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446, 455 (2019). As one jurist has aptly explained in the UCC/banking context,

> Placing liability with the least-cost avoider increases the incentive for that party to adopt preventive measures and ensures that such measures would have the greatest marginal effect on preventing the loss. This efficiency-promoting principle informs the burden-shifting provisions of the UCC, D.C.Code §§ 28:3–406, 28:4–406. *See Putnam Rolling Ladder Co., Inc. v. Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 547 N.Y.S.2d 611, 613, 546 N.E.2d 904, 908 (1989) ("By prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care, the UCC not only guides commercial behavior but also increases certainty in the marketplace and efficiency in dispute resolution.").

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Riggs Nat. Bank of Washington, D.C.*, 5 F.3d 554, 557 (D.C. Cir. 1993)

Finally, based on its review of Pennsylvania case law the Court finds that Plaintiff has plausibly alleged that PNC, in breach of its common law duties: (a) failed to exercise reasonable care in its account opening and administration and (b) permitted withdrawal of the diverted funds transfer in the face of actual or constructive knowledge of beneficiary misidentification; and thereby substantially contributed to the fraudulent diversion of the Church's chapel-building fund. Because PNC's alleged negligent conduct was beyond the scope of the wire transfer itself, EVBC's common law claim against PNC is not preempted.  On the other hand, the SAC does not allege conduct beyond the scope of the wire transfer on the part of FNB that plausibly contributed to EVBC's injury, and consequently EVBC's common law negligence claim against FNB is preempted.

Based on the foregoing, Defendant PNC Bank, N.A.'s Motion to Dismiss (Docket No. 33) is DENIED; and Defendant F.N.B. Corporation's Motion to Dismiss (Docket No. 38) is GRANTED in part and DENIED in part. Said Motion is granted to the extent that Count IV of Plaintiff's Second Amended Complaint is dismissed, with prejudice.  An appropriate Order follows.

> _/s/ Nora Barry Fischer_
> Nora Barry Fischer
> Senior U.S. District Judge

Dated:  September 10, 2024

cc/ecf:  All counsel of record

---

(Silberman, J., concurring), *quoted in part in DeVries*, 586 U.S. at 460 n.3 (Gorsuch, J., dissenting).

The Code provisions and Official Comments of UCC §§ 4A-207 and 1-202(f) strongly suggest that the drafters applied the same principles in advancement of the same goals.